PUBLISH

UNITED STATES COURT OF APPEALS

**Filed 11/12/96**

TENTH CIRCUIT

---

JESSICA ANDERSEN,

      Plaintiff - Appellant,

vs.

O. LANE MCCOTTER, in his official
capacity as Executive Director of the Utah
Department of Corrections; GARY
BORTOLUSSI; KATHERINE OCKEY;
BETTY GAINES-JONES; RAYMOND
H. WAHL,

      Defendants - Appellees.

No. 95-4186

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 94-CV-372)

---

Nathan B. Wilcox, Anderson & Karrenberg, (Ross C. Anderson and Kate A. Toomey
with him on the brief), Salt Lake City, Utah, for Plaintiff - Appellant.

Norman E. Plate, Assistant Utah Attorney General, (Jan Graham, Utah Attorney General,
with him on the brief), Salt Lake City, Utah, for Defendants - Appellees.

---

Before EBEL, KELLY and BRISCOE, Circuit Judges.

---

KELLY, Circuit Judge.

---

Plaintiff-Appellant Jessica Andersen appeals from the grant of summary judgment in favor of Defendants-Appellees on her civil rights claim under 42 U.S.C. § 1983. Plaintiff sought injunctive relief against O. Lane McCotter, in his official capacity as Executive Director of the Utah Department of Corrections (DOC), and monetary relief against various corrections officials, in their individual capacities, claiming that she was fired from her position as an intern with the DOC in retaliation for exercising her First Amendment rights. Defendants filed a motion to dismiss for failure to state a claim upon which relief could be granted under Fed. R. Civ. P. 12(b)(6), arguing that they were protected by the doctrine of qualified immunity. The motion was supported by affidavits, and was therefore treated by the district court as a motion for summary judgment under Fed. R. Civ. P. 56. Applying the two-step qualified immunity analysis, the district court found in the first instance that Defendants' actions did not violate Plaintiff's First Amendment rights, and thus granted summary judgment. We exercise jurisdiction under 28 U.S.C. § 1291 and reverse.

Background

In the summer of 1993, Ms. Andersen, then a student at Weber State University, began an internship with the Utah Board of Pardons. She received college credit, and was paid for twenty hours of work per week. In September 1993, she was granted permission by the Board of Pardons to work at the Bonneville Community Corrections Center

- 2 -

(BCCC), a facility managed by the DOC. Ms. Andersen's work at BCCC was credited by the Board of Pardons toward the wages it paid her. Until March 1994, Ms. Andersen worked as an intern at BCCC two nights per week, assisting in a therapy program for sex-offenders.

Early in 1994 the DOC announced proposed changes in the sex-offender treatment program. In February 1994, Ms. Andersen was interviewed by a Salt Lake City television station. During the interview, which was televised on the evening news, she criticized the proposed changes, expressing her concern that the changes could result in the premature release of potentially dangerous sex-offenders into the community. Ms. Andersen confined her comments to expressing her own opinion, and did not disclose any confidential information. The next day Ms. Andersen was informed that she was being terminated because she had said "something negative about the Department," thus violating official DOC policy. The policy prohibited DOC employees from speaking to the media without prior authorization.

Ms. Andersen filed suit under § 1983, alleging that her criticism of the proposed changes to the sex-offender treatment program constituted speech on a matter of public concern, and was therefore protected by the First Amendment. She further alleged that her exercise of her First Amendment rights was the sole motivating factor in her dismissal. Defendants claimed qualified immunity, arguing that Ms. Andersen's status as a "volunteer" controlled the issue, and that the law was not clearly established that

volunteers were afforded the same First Amendment protection as employees. In the first part of the two-part qualified immunity analysis, the district court concluded that Ms. Andersen's constitutional rights were not violated, and therefore did not reach the second step in the qualified immunity analysis. See Siegert v. Gilley, 500 U.S. 226, 232 (1991); Hinton v. City of Elwood, Kan., 997 F.2d 774, 779-80 (10th Cir. 1993). In making this determination, the district court applied the balancing test set forth in Pickering v. Board of Educ., 391 U.S. 563, 568 (1967), weighing Ms. Andersen's interest in commenting upon matters of public concern against the DOC's interest, as a government employer, in promoting the efficiency of the public services it performs.

On appeal, Ms. Andersen claims that her position with the DOC was a valuable governmental benefit which could only be denied in a manner that comports with the protections of the First Amendment. As such, she was entitled to the same protection under Pickering as any public employee. In addition, she argues that the district court improperly granted summary judgment because it performed the Pickering balancing test without sufficient evidence. She also claims that the law was clearly established in this area, thereby precluding Defendants' claims of qualified immunity. We agree.

Discussion

We review the district court's grant of summary judgment de novo. Hom v. Squire, 81 F.3d 969, 973 (10th Cir. 1996). Summary judgment is appropriate when there

is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When the First Amendment is implicated, we are obligated to "make an independent examination of the whole record" in order to ensure that "the judgment does not constitute a forbidden intrusion on the field of free expression." Melton v. City of Oklahoma City, 879 F.2d 706, 713 (10th Cir. 1989) (quoting Bose Corp. v. Consumers Union of United States, 466 U.S. 485, 499 (1984)).

## I.    First Amendment Protection

As an initial matter, we must determine whether Ms. Andersen is entitled to the same First Amendment protections long recognized for public employees. Defendants argue that Ms. Andersen was simply a volunteer, and as such cannot claim she was deprived of a valuable governmental benefit or privilege because (1) she received no remuneration from the DOC for her services at BCCC, (2) the college credit she received for her internship was not necessary for the completion of her degree, and (3) the DOC policy manual governing volunteers specifically provided that the position could be terminated at any time for any reason by either party. Essentially, Defendants argue that because Ms. Andersen's position could be terminated "at will," it cannot be viewed as a valuable governmental benefit. We are not persuaded. The uncontroverted facts indicate that Ms. Andersen was, for all relevant purposes, a public employee.

Whether Ms. Andersen was a public employee or volunteer for purposes of applying the First Amendment is a matter of state law. Cf. Jones v. University of Central Okla., 13 F.3d 361, 364-65 (10th Cir. 1993) (whether an employee has a property interest in employment for purposes of the Fourteenth amendment requires reference to state law). Under Utah law, "'an employee is hired and paid a salary or wage, works under the direction of the employer, and is subject to the employer's control.'" Gourdin ex rel. Close v. Sharon's Cultural Educ. Recreational Ass'n, 845 P.2d 242, 244 (Utah 1992) (quoting Board of Educ. of Alpine Sch. Dst. v. Olsen, 684 P.2d 49, 52 (Utah 1984)). The Utah Volunteer Government Workers Act defines a "Volunteer" as "any person who donates service without pay or other compensation except expenses actually and reasonably incurred as approved by the supervising agency." Utah Code Ann. § 67-20-2 (3)(a) (Supp. 1995). Section Cgr06/01.03 of the DOC's Adult Probation and Parole Manual defines a "Volunteer" as "an individual who provides uncoerced and uncompensated services, including intern services, for the Field Operations Division." Aplt. App. at 45.

Though an intern, Ms. Andersen did not provide uncompensated services; she was paid for twenty hours of work per week. The fact that she was paid by the Board of Pardons instead of directly by the DOC does not alter the source of the payment—the State of Utah. The hours Ms. Andersen worked at BCCC were credited by the Board of Pardons toward the wages it paid her. She was, in effect, loaned by the Board of Pardons

to the DOC. Ms. Andersen also received college credit for her work at BCCC. Whether that particular credit was required for completion of her degree is a separate matter from whether such credit has value. It is uncontroverted that the educational institution granted credit for the experience, thereby conferring a nonmonetary benefit upon Ms. Andersen in exchange for her continued participation in the State program.

Ms. Andersen worked under the direction of officials at BCCC, and was subject to their control. Under the terms of her unsigned agreement with the DOC, Ms. Andersen was required to:

4. attend orientation, on-the-job, and in-service training as directed;
. . . .
6. follow instructions of paid staff members to whom [she was] responsible;
. . . .
8. accept the responsibility of completing assignments and meeting the agreed upon work schedule; and

9. conduct [herself] with the dignity and assurance of a qualified member of a team performing a needed service in a pleasant and efficient manner.

Aplt. App. 52. Although the agreement was entitled "Volunteer Agreement," we believe that the proper focus must be on analyzing the uncontroverted facts about the relationship against a backdrop of state employment law, "cutting through the convenient labeling of plaintiff as a 'volunteer,'" Aplt. App. 142. Therefore, we conclude that under Utah law, and by the terms of the DOC's own policies and manuals, Ms. Andersen was not a volunteer—she was obviously a government employee.

Finally, the fact that Ms. Andersen's employment position was terminable at will does not diminish her First Amendment claim.

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to produce a result which [it] could not command directly. Such interference with constitutional rights is impermissible.

Perry v. Sindermann, 408 U.S. 593, 597 (1972) (citations and quotations omitted); see also Rutan v. Republican Party, 497 U.S. 62, 72 (1990) ("[T]he assertion here that the employee petitioners . . . had no legal entitlement to promotion, transfer, or recall [is] beside the point."); Rankin v. McPherson, 483 U.S. 378, 383-84 (1987) (holding that a probationary at-will employee is entitled to First Amendment protection); Seamons v. Snow, 84 F.3d 1226, 1236 (10th Cir. 1996); Abercrombie v. City of Catoosa, Okla., 896 F.2d 1228, 1233 (10th Cir. 1990).

When acting as a sovereign, the government may not, in the absence of justification, restrict an individual's right to speak freely on matters of public import, nor may the government indirectly exert leverage to suppress speech by unconstitutionally tying the receipt of benefits to the speaker's coerced silence. We hold that Ms. Andersen's termination from her employment position as an intern with the DOC because

of her public comment on the DOC's proposed changes in the sex-offender treatment program implicated her First Amendment rights, and invoked the protections afforded by the Pickering balancing test. However, even if we accepted Defendants' arguments and considered Ms. Andersen a nonpaid volunteer, her claim would not be defeated. Defendants argue that volunteers are not entitled to First Amendment protection under Pickering. We disagree. The exercise of free speech rights is not dependent upon the receipt of a full-time salary. "[O]ur modern 'unconstitutional conditions' doctrine holds that the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' . . . ." Board of County Comm'rs v. Umbehr, 116 S. Ct. 2342, 2347 (1996) (quoting Perry, 408 U.S. at 597). For example, the Court has recognized a variety of benefits which cannot be denied solely because of the exercise of constitutional rights. See, e.g., Rutan, 497 U.S. at 72-73 (promotion or transfer in a government job); Shapiro v. Thompson, 394 U.S. 618, 627 n.6 (1969) (welfare benefits); Sherbert v. Verner, 374 U.S. 398, 404-05 (1963) (unemployment benefits); Speiser v. Randall, 357 U.S. 513, 525-26 (1958) (tax exemptions).

Having concluded that a protectible interest exists, we must ascertain whether the court properly balanced the interests of the institution against those of the plaintiff. The district court merely took the DOC's written policy and, in essence, concluded that because it was in writing it was therefore justified. A government employer can deny the benefit of employment to an employee who speaks out against it on a matter of public

concern only if it can show that such speech adversely affects the efficiency or effectiveness of its operations, see Pickering, 391 U.S. at 568, and that the government's interest, as an employer, outweighs the individual employee's interest in the particular speech. Id. It is no different here. If Ms. Andersen's speech on a matter of public concern sufficiently disrupted the operations of the DOC, the benefit of the opportunity to work at BCCC may also be denied. Pickering and its progeny make no distinctions based on the type of benefit received by the individual. Thus, any benefits conferred by government employers may be limited or denied on the basis of speech, but only if that speech adversely affects the government employer's ability to carry out its operations and if the adverse effect to the government outweighs the interests of the speaker. The government employer must justify the denial of benefits by showing that its interest in maintaining efficient operations actually outweighs the individual's interest in her speech on matters of public concern. Since Ms. Andersen was deprived of this benefit by a government employer, we must apply the Pickering balancing test to determine whether this termination violated her First Amendment rights.

In order for Ms. Andersen to prevail on a claim that her dismissal violated her First Amendment rights, the court must first determine that her speech is constitutionally protected. Hom, 81 F.3d at 974; Moore v. City of Wynnewood, 57 F.3d 924, 931 (10th Cir. 1995). To establish that speech is protected, the plaintiff must first show that the speech involves a matter of public concern and not merely an issue internal to the

workplace.  Connick v. Myers, 461 U.S. 138, 146-47 (1983); Moore, 57 F.3d at 931.  If the speech does involve a matter of public concern, the plaintiff must then show that her interest in the expression outweighs the government's interest in promoting the efficiency of the public services it performs through its employees.  Pickering, 391 U.S. at 568; Considine v. Board of County Comm'rs, 910 F.2d 695, 700 (10th Cir. 1990).  In this regard, the "[s]tate bears a burden of justifying the discharge on legitimate grounds." Rankin, 483 U.S. at 388; Connick, 461 U.S. at 150; Considine, 910 F.2d at 700-01. These are questions of law for the district court.

If the balance in the Pickering test tips in favor of the plaintiff—meaning the speech in question is protected—the plaintiff must then show that the speech was a substantial or motivating factor in the decision to deny the benefit.  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Hom, 81 F.3d at 974.  The government then has the burden to show that it would have reached the same decision in the absence of the protected speech.  Mt. Healthy, 429 U.S. at 287; Hom, 81 F.3d at 974. These are questions of fact for the jury.

The parties agree and the district court found that Ms. Andersen's statements criticizing the DOC's proposed changes in its sex-offender treatment policy did constitute speech on a matter of public concern.  At issue here is the district court's application of the Pickering balancing test.

The district court granted summary judgment to Defendants because it found that Ms. Andersen's interest in voicing her criticism was "clearly outweighed" by the DOC's interest in enforcing its Code of Conduct. In so deciding, the court found (1) that Ms. Andersen's criticisms were "unwarranted," (2) that the criticism "undermine[d] public confidence" in the DOC, and (3) that Ms. Andersen's noncompliance with DOC policy—speaking to the public without prior authorization—"interfered with the regular operation of the DOC." Such conclusions might be proper after balancing the interests under Pickering, if they were supported by evidence. In this case, however, Defendants put forth no evidence to support the district court's findings. Instead, they rely solely on statements contained in the DOC's Code of Conduct and its Community Relations Manual. Section AE 02/03.01 (O) of the Code of Conduct provides that "[n]o member shall act or behave privately or officially in such a manner that undermines the efficiency of the Department, causes the public to lose confidence in the Department, or brings discredit upon himself, the State of Utah, or the Department." Aplt. App. at 33. Section AE 02/03.06 states that "[m]embers shall not make critical or disloyal public remarks about any policy, procedure, official act, or other member of the Department . . . ." Aplt. App. at 35. The Community Relations policy expressly states that public criticism "undermines public confidence in the DOC" and, therefore, is forbidden. Aplt. App. at 37.

Here, there is no integration of facts with the policy statements. It is the governmental defendant's burden to justify the challenged discharge on legitimate grounds. Considine, 910 F.2d at 700-01. The government does not have to wait for speech to actually disrupt core operations before it takes any action, and its reasonable predictions of harm used to justify restriction of employee speech are entitled to some deference. Moore, 57 F.3d at 934 (citing Waters v. Churchill, 511 U.S. 661, ____, 114 S. Ct. 1878, 1887 (1994)). However, "[t]he government cannot rely on purely speculative allegations that certain statements caused or will cause disruption to justify the regulation of employee speech." Moore, 57 F.3d at 934; Wulf v. City of Wichita, 883 F.2d 842, 862 (10th Cir. 1989). The Pickering balancing test requires a "fact-sensitive" weighing of the government's interests. Umbehr, 116 S. Ct. at 2348. Necessarily, Defendants must provide evidence sufficient to assess the character and weight of the DOC's interests. Considine, 910 F.2d at 701. Defendants provided no such evidence. Accordingly, at this stage of the proceedings, Defendants are not entitled to summary judgment.

## II. Qualified Immunity

The district court found that Defendants' actions did not violate Ms. Andersen's constitutional rights, and therefore did not address whether, in the event of such a violation, Defendants would be entitled to qualified immunity. We have concluded, however, that the allegations at least implicate a clearly established right. Because both

- 13 -

parties fully argued the issue of qualified immunity before the district court and on appeal, and because we find that the proper resolution is apparent, we will consider this legal question. See Singleton v. Wulff, 428 U.S. 106, 121 (1976); Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1229 (10th Cir. 1996); Medina v. City and County of Denver, 960 F.2d 1493, 1497 (10th Cir. 1992).

Qualified immunity protects a government official from personal liability and the burden of having to go to trial unless he violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Moore, 57 F.3d at 931. Defendants argue that even if Ms. Andersen's termination violated her First Amendment rights, they are entitled to qualified immunity because the law was not clearly established in March 1994 that a volunteer had the same rights as an employee or that one's volunteer status could not be revoked on the basis of protected speech. But see Hyland v. Wonder, 972 F.2d 1129, 1136 (9th Cir. 1992), cert. denied, 508 U.S. 908 (1993); Jaunsaitis v. Middlebury Volunteer Fire Dep't, 607 F.2d 17, 25 (2d Cir. 1979). We need not decide whether it was clearly established before this case that volunteers had Pickering protection, because Ms. Andersen was not a volunteer. As discussed above, she was a public employee who was paid by the State of Utah, who worked under the direction of officials at BCCC and who was subject to the control of the DOC. See Gourdin, 845 P.2d at 244. The law has been clearly established since 1968 that public employees may not be discharged in retaliation

for speaking on matters of public concern, absent a showing that the government employer's interest in the efficiency of its operations outweighs the employee's interest in the speech. Pickering, 391 U.S. at 568; Rankin, 483 U.S. at 388; Hom, 81 F.3d at 974; Moore, 57 F.3d at 931. Because the law in this area was clearly established in March 1994, Defendants are not entitled to qualified immunity.

REVERSED and REMANDED.