**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 5 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ROBERT LACKEY,

Plaintiff-Appellant,

v.

COUNTY OF BERNALILLO and
MATT THOMAS

Defendants-Appellees.

No. 97-2265
(D.C. No. CIV-96-32-LH)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, **BALDOCK**, and **BRISCOE**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1 (G). The case is therefore ordered submitted without oral argument.

Plaintiff Robert Lackey appeals the district court's entry of summary

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

judgment in favor of defendants Bernalillo County and Matt Thomas in this § 1983 action. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

Lackey resides on Zena Lona Drive in Albuquerque, Bernalillo County, New Mexico. In May 1995, after learning his neighbor Peter Acquiar was a convicted child molester, Lackey began alerting families with small children in his neighborhood about Acquiar.

Acquiar was a government witness in a major federal drug trafficking/ murder/racketeering case, a fact unknown by Lackey. In preparation for the trial of that case, Acquiar had been interviewed on two occasions by Thomas, a Bernalillo County Sheriff's Officer who was temporarily deputized as a Special Federal Officer of the Drug Enforcement Administration. Acquiar telephoned Thomas on multiple occasions in May-June 1995 to complain of threats by Lackey, specifically claiming Lackey pointed weapons at him. The record does not reveal the frequency of these events but, at least once, Lackey put a round in a shotgun chamber while he aimed the gun directly at Acquiar. Lackey also used a weapon with a laser-sighting device to point an infrared dot on Acquiar's body as he walked down the street. Acquiar told Thomas that Lackey also pointed guns at and threatened other individuals, including children, in the neighborhood. After each telephone complaint, Thomas told Acquiar to file a report and to avoid

-2-

Lackey whenever possible.

On June 2, 1995, after receiving another call from Acquiar and learning the threat had led to a fight in Lackey's front yard, Thomas decided the Albuquerque police should be notified. Thomas contacted Vern Perry, the sheriff's dispatcher, and asked her to notify the police of Lackey's activities.

> THOMAS: Vern, I'd like for you to do me a favor. I got a snitch living off of Zena Lona, Northeast, and he's on parole, and he's getting a lot of bullshit from his neighbor a couple of doors down. But the way I understand it, it's a neighborhood problem; it's not just him. But he's targeted the snitch, for the most part. And what do you do when you get a gun freak?
> His name is Robert Lackey. . . . He's one of these guys that's up like all night long, and he's--people are walking by and he's cranking rounds in the shotguns and pointing guns at them with laser sights. And he's done some kids and stuff up there, too. And I was wondering if you wouldn't mind calling [A]PD, or see if they would go up there and check him out, but use some real 48 [a police code meaning "use caution"]. He's the type of guy that likes to run down the street naked, and he's a little 22. [1] (Laughter) Believe it.
> PERRY: Why do you do this to me?
> THOMAS: I don't know. I know.
> PERRY: I would rather give you $4,000 than do this.
> THOMAS: I know. Well, he's a gun nut. And I was just wondering if you could just say, you know, "Hey, we're getting, you know, a complaint," or whatever. If you guys could check this guy out for guns and stuff like that, make sure he's not harassing the neighbors and--you know, I mean, he's like--you know those red dot laser scopes?
> PERRY: Oh, yeah.
> THOMAS: I mean, you walk down the street and you got a red dot on you, type of nonsense.
> . . . .

---

[1] The record does not indicate the meaning of code "22."

PERRY: This guy is a nut.
THOMAS: Yeah, he's a nut.
PERRY: But when did, like, all this go on?
THOMAS: Huh? Well, it's constant. It's nonstop. He's up all night long, 2:00. 3:00, 4:00, 5:00. I've driven by at 4:00 in the morning. He's been up, sitting on the front porch.
PERRY: Oh, my God.
THOMAS: Yeah. He's a little bit of a lunatic. That's the way I understand it. And I just want it real low-key and say, "Hey"--you know, could you guys just check him out, make sure everything is cool. Let him know that, "Hey, we're getting complaints, and you need to tone down."
PERRY: Oh, my gosh. Okay.

Appellant's App. at 108-09. It is undisputed this conversation represented Thomas' total involvement in the case.

Perry apparently followed up on Thomas' request by contacting the Albuquerque police, who sent two officers to Lackey's home. That evening, the officers walked into Lackey's garage to talk to him. Lackey asked why they were there and the officers responded they were investigating a report of a laser sight being aimed in the area. Neither officer requested entrance to Lackey's house. Lackey opened the door leading into the house from the garage and the officers entered the house. The officers observed a Colt .45 automatic in plain view and asked if Lackey had additional guns. Lackey voluntarily pointed out his remaining guns, and the officers left. On June 4, 1995, Lackey wrote a letter to the Albuquerque police commending the professional manner in which the officers had conducted themselves. He specifically noted he had "invited" the

-4-

officers into his house.

On November 17, 1995, Lackey filed a malicious prosecution action against Thomas in Bernalillo County Metropolitan Court and Thomas was defended in that action at county expense. Lackey later dismissed the action with prejudice after he met with his congressman and was assured the matter would be referred to Attorney General Janet Reno. On March 8, 1996, Lackey filed the present federal action against Thomas and Bernalillo County. The district court granted summary judgment in favor of defendants on the basis of qualified immunity.

## II.

We review a grant of summary judgment de novo, applying the same legal standard used by the district court. Sundance Assocs., Inc. v. Reno , 139 F.3d 804, 807 (10th Cir. 1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. If no genuine issue of material fact is in dispute, we next determine whether the district court correctly applied the appropriate substantive law. Sundance , 139 F.3d at 807.

III.

Lackey claims Thomas violated his federal constitutional rights under the First and Fourth Amendments by requesting that police investigate Lackey in retaliation for his constitutionally-protected speech in opposition to Acquiar. Lackey further claims Bernalillo County contravened his "civil and constitutional rights" by providing Thomas with a free legal defense in the malicious prosecution action. In their joint motion for summary judgment, Thomas asserted a qualified immunity defense and Bernalillo County denied liability based on the absence of a county policy or custom infringing upon any of Lackey's constitutional rights.

**Qualified Immunity**

Qualified immunity protects public officials from individual liability in actions brought pursuant to 42 U.S.C. § 1983 unless the officials violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). [2] This defense is

---

[2] The district court incorrectly held Bernalillo County was entitled to qualified immunity. See Owen v. City of Independence, 445 U.S. 622, 638 (1980); Valdez v. City and County of Denver, 878 F.2d 1285, 1287 n.2 (10th Cir. 1989). Municipal liability turns on the existence of a policy or custom that precipitated the plaintiff's injury. See Board of County Comm'rs v. Brown, 520 U.S. 397 (1997); Monell v. New York City Dep't of Social Servs., 436 U.S. 658,

(continued...)

designed to shield government officials from suit, not merely from liability. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Once a public official raises a qualified immunity defense, the plaintiff initially bears a heavy two-part burden. Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir. 1995). "First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right. . . . Second, the plaintiff must show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." Id. Unless both prongs are satisfied, the defendant will not be required to "engage in expensive and time consuming preparation to defend the suit on its merits." Siegert v. Gilley, 500 U.S. 226, 232 (1991). If the plaintiff fails to demonstrate defendant's conduct violated the law, the court need not determine whether the law was clearly established. Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993).

In his First Amendment claim, Lackey alleges Thomas falsely reported to the Albuquerque police (through the Bernalillo County Sheriff's dispatcher) that Lackey had been involved in criminal activities. Lackey does not deny having threatened Acquiar and other neighbors with guns, but apparently considers such conduct lawful. Lackey contends Thomas made the "false" statements in

---

[2](...continued)
694 (1978).

retaliation for Lackey's vocal criticism of Acquiar.

Although retaliation is not expressly discussed in the Constitution, it may be actionable inasmuch as governmental retaliation tends to chill citizens' exercise of their constitutional rights. American Civil Liberties Union of Md., Inc. v. Wicomico County, 999 F.2d 780, 785 (4th Cir. 1993) (citing Perry v. Sindermann, 408 U.S. 593, 597 (1972)). Any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom. See Smart v. Board of Trustees, 34 F.3d 432, 434 (7th Cir. 1994); Reporters Committee for Freedom of the Press v. AT&T Co., 593 F.2d 1030, 1064 (D.C. Cir. 1978). To prevail on a claim of unconstitutional retaliation in violation of the First Amendment, a plaintiff must establish (1) he was engaged in constitutionally protected activity, (2) defendant's actions caused him to suffer an injury that likely would chill a person of ordinary firmness from continuing to engage in that activity, and (3) defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir. 1998); see Connell v. Signoracci, 153 F.3d 74, 79 (2d Cir. 1998).[3] "An act taken in

_____

[3] The First Amendment retaliation test set out in the employment context is not fully applicable here. Indeed, "the government has a freer hand in regulating

(continued...)

retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper."  DeLoach v. Bevers , 922 F.2d 618, 620 (10th Cir. 1990) (citation omitted).

Defendants do not dispute Lackey was engaged in protected speech while informing his neighbors of Acquiar's presence and convicted pedophile status. See Andersen v. McCotter , 100 F.3d 723, 728 (10th Cir. 1996) (plaintiff's statements criticizing state's sex-offender treatment policy constitute speech on matter of public concern).  Defendants insist, however, that Lackey suffered no adversity as a result of Thomas' conduct.  We need not resolve this issue. Regardless of any injuries to Lackey, he cannot demonstrate Thomas' actions were motivated by an unconstitutional animus.  This court utilizes a two-part test in examining this issue of intent in the context of a summary judgment motion based on qualified immunity:

> When state of mind is an essential element of the plaintiff's substantive claim, we have adopted a modified approach to considering a public official's qualified immunity defense on a motion for summary judgment.  First, the defendant must make a prima facie showing of the objective reasonableness of the challenged conduct.  If Defendant[] carr[ies its] burden of showing

---

[3](...continued)
the speech of its employees than in regulating the speech of the public at large." Wright v. Illinois Dep't of Children & Family Servs.    , 40 F.3d 1492, 1500 (7th Cir. 1994).

-9-

objective reasonableness, the burden then shifts to Plaintiff[] to establish that Defendant[] acted on the basis of a culpable subjective state of mind. Once the defendant has shown his or her objective reasonableness, the plaintiff's burden to establish subjective motivating animus becomes heightened, requiring specific and concrete evidence rather than mere speculation.

Gehl Group v. Koby, 63 F.3d 1528, 1535 (10th Cir. 1995) (quotations and citations omitted).

Thomas has clearly set forth an objectively reasonable explanation for his decision to contact Albuquerque police to request an investigation into Lackey's conduct. Based on repeated telephone calls from Acquiar, Thomas had good reason to believe Lackey posed a danger to Acquiar and other residents in the neighborhood, including children. The fact that Thomas initially refrained from contacting the local police and encouraged Acquiar simply to file police reports shows, if anything, a lack of sinister motive.

Lackey contends Thomas attempted to manipulate the facts to chill Lackey's free speech, pointing to language in the dispatch transcript where Thomas asked Perry to "do [him] a favor" and recommended officers employ caution in any investigation. This argument is without merit. Lackey did not deny threatening Acquiar and other neighbors at gunpoint. Thus, both Thomas' description of Lackey as a "gun nut" and his recommendation that officers proceed with care had factual bases. An examination of the full dispatch transcript reveals Lackey has taken the "do me a favor" language out of context.

-10-

Thomas invoked this phrase merely as an introductory remark, a gesture of respect and deference to a fellow law enforcement official. Moreover, Thomas made it clear he was concerned not only with Lackey's treatment of Acquiar, but also with the potentially violent hostility Lackey displayed to others in the neighborhood. The record is devoid of evidence suggesting an unconstitutional animus on the part of Thomas.

Lackey's Fourth Amendment claim is equally meritless. Lackey contends Thomas gave false information to Albuquerque police to facilitate a search of Lackey's home. An officer violates an individual's Fourth Amendment rights by knowingly or recklessly making a false statement in an affidavit in support of an arrest or search warrant if the false statement was material to the finding of probable cause. Bruning v. Pixler, 949 F.2d 352, 357 (10th Cir. 1991). Such a scenario is not present here. The information Thomas provided to the police was truthful. Thomas did not file an affidavit or seek a warrant to search Lackey's house. Lackey acknowledged in his letter to the Albuquerque police that he had voluntarily invited officers into his house. If Lackey believed those officers coerced his consent, he could have sued the officers. However, Lackey cannot hold Thomas responsible for the acts of the officers.

**Municipal Liability Standards**

Lackey also alleges Bernalillo County ratified Thomas' allegedly unconstitutional conduct by providing a free legal defense in Lackey's malicious prosecution action. This claim must fail as a matter of law. "A municipality may not be held liable where there was no underlying constitutional violation by any of its officers." Hinton , 997 F.2d at 782. Lackey's malicious prosecution action was predicated on a prosecution of his own imagining. No criminal charges were filed against Lackey. Further, Lackey has failed to establish that Thomas committed any constitutional violation. Therefore, the county cannot be held liable for allegedly ratifying Thomas' conduct.

AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge