**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 6 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JESSICA ANDERSEN,

        Plaintiff - Appellant,

    v.

O. LANE MCCOTTER, in his official
capacity as Executive Director of the
Utah Department of Corrections;
KATHERINE OCKEY; BETTY
GAINES JONES; RAYMOND H.
WAHL,

        Defendants - Appellees.

No. 98-4072

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D. Ct. No. 94-CV-372-B)**

---

Nathan B. Wilcox (Ross C. Anderson, with him on the briefs), Anderson &
Karrenberg, Salt Lake City, Utah, appearing for Plaintiff-Appellant.

Brent A. Burnett, Assistant Attorney General (Debra J. Moore, Assistant Attorney
General, on the brief), Salt Lake City, Utah, appearing for Defendants-Appellees.

---

Before **TACHA** , **BRORBY** , and **EBEL** , Circuit Judges.

---

**TACHA** , Circuit Judge.

Plaintiff Jessica Andersen appeals from the district court's order dismissing her claims brought under 42 U.S.C. § 1983. We exercise jurisdiction pursuant to 18 U.S.C. § 1291 and affirm.

I.

In 1993, Andersen began a paid student internship with the Utah Board of Pardons ("Board"). Within a month, the Board granted Andersen permission to volunteer additional time at the Bonneville Community Corrections Center ("Bonneville"), a halfway house for sex offenders managed by the Utah Department of Corrections (DOC). Before Andersen's Bonneville internship began, defendant Kathy Ockey, Bonneville's program coordinator, explained the DOC's Code of Conduct to Andersen. One of the Code's policies required personnel to obtain prior authorization before speaking to the public about DOC matters. At the end of her orientation, Andersen agreed to abide by all DOC policies. Andersen initially performed clerical tasks at Bonneville and eventually participated in a therapy program. During her internship, she had access to sensitive information concerning inmates and the Bonneville facility itself.

Early in 1994, a Salt Lake City television reporter interviewed Bonneville and other DOC personnel for a story about proposed changes to the Bonneville program. Under the proposed changes, independent contractors would treat Bonneville inmates instead of internal staff members. The DOC believed that

2

privatization of the program would result in more treatment for sex offenders without dramatically increasing costs. DOC officials were concerned that a premature announcement of the proposed changes would upset the inmates and make them less responsive to their current treatment providers. Thus, the DOC hoped to postpone formal announcement of the program changes until the details were finalized.

Andersen and her supervisor, Dr. Stephen Kramer, were both opposed to the proposed changes. Andersen knew that if the changes were implemented, Dr. Kramer would lose his position and her own position would be eliminated. The television reporter interviewed Andersen, and Andersen agreed to be identified and quoted in the story. The story aired twice on March 8, 1994 before the DOC had finalized the changes or informed inmates about the changes. Andersen appeared in the story and was identified as a Bonneville volunteer. She asserted that the proposed changes would result in an increased risk to the public by reducing severely the quantity and effectiveness of treatment for Bonneville inmates.

Betty Gaines-Jones, a DOC regional administrator with responsibility for Bonneville, saw the news story and contacted Kathy Ockey. Gaines-Jones and Ockey then held a conference call with defendant Raymond Wahl, DOC Director of Field Operations. They concluded that Andersen's statement undermined

relations among Bonneville inmates, staff and the community, and that inmate agitation over the news story presented a danger to staff, including Andersen, and the community. To counteract the effects of the story, they tightened security at Bonneville and terminated Andersen's internship.

Andersen filed suit for injunctive and monetary relief under 42 U.S.C. § 1983, naming various DOC administrators in their official or individual capacities. She claimed that the DOC violated her First Amendment right to speak on a matter of public concern. The district court granted summary judgment to defendants after applying the balancing test set forth in Pickering v. Board of Educ., 391 U.S. 563, 568 (1968) and Connick v. Myers, 461 U.S. 138, 146-54 (1983). The court found that Andersen's interest in voicing her criticism was clearly outweighed by the DOC's interest in enforcing its Code of Conduct and thus held that her First Amendment rights had not been violated.

On appeal, we reversed and remanded. Andersen v. McCotter, 100 F.3d 723, 729 (10th Cir. 1996) ("Andersen I"). We found that defendants had not put forth sufficient evidence for the district court properly to "assess the character and weight of the DOC's interests." Id. at 728-29. Thus, we concluded that "at this stage of the proceedings, [defendants were] not entitled to summary judgment." Id. at 729.

On remand, the district court held a bench trial and again found in favor of

4

defendants on Andersen's First Amendment claim. The court also found that the defendants were entitled to qualified immunity from suit. We agree that defendants did not violate Andersen's First Amendment rights, and we therefore do not address the district court's findings on qualified immunity.

II.

We review de novo the district court's "findings of constitutional fact and its ultimate conclusions of constitutional law." Revo v. Disciplinary Bd. of the Supreme Court , 106 F.3d 929, 932 (10th Cir. 1997). In First Amendment cases, de novo review is appropriate because "an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." Mesa v. White , 197 F.3d 1041, 1043 (10th Cir. 1999) (internal quotation marks and citation omitted).

To determine whether defendants violated Andersen's First Amendment rights, we must first decide whether her speech involved a "matter of public concern." Connick , 461 U.S. at 146. If so, then we must balance Andersen's interest in expression and Utah's interest "in promoting the efficiency of the public services it performs through its employees." Pickering , 391 U.S. at 568. Andersen's speech is protected by the First Amendment only if her interest outweighs Utah's interest. Dill v. City of Edmond , 155 F.3d 1193, 1201 (10th

5

Cir. 1998). If the Pickering balance tips in favor of the plaintiff, the plaintiff must then show that the speech "was a substantial or motivating factor" in the decision to terminate her. Andersen I , 100 F.3d at 728. "The government then has the burden to show that it would have reached the same decision in the absence of the protected speech." Id.

### III.

The district court found that Andersen's televised statement addressed a matter of public concern. We agree. Potential changes in a treatment program for sex offenders in a halfway house, especially changes that might reduce the quantity and quality of treatment provided, are of interest to the community. See Dill, 155 F.3d at 1202 ("Matters of public concern are those of interest to the community, whether for social, political or other reasons.").

The district court also found that defendants were justified in terminating Andersen because the DOC's interest in promoting the efficiency of Bonneville's public services outweighed Andersen's interest in speaking on a matter of public concern. Again, we agree.

Under the Pickering balancing test, a government employee's First Amendment free speech rights "may not be restricted unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee." Id. at 1203 (internal quotation

6

marks and citation omitted). We give "greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." Waters v. Churchill, 511 U.S. 661, 673 (1994). However, "[t]he government . . . cannot rely on purely speculative allegations that certain statements caused or will cause disruption to justify the regulation of employee speech." Gardetto v. Mason, 100 F.3d 803, 815-16 (10th Cir. 1996). Instead, the government must articulate specific concerns about the impact of an employee's speech, see Dill, 155 F.3d at 1203, and those concerns must be reasonable and formed in good faith, Waters, 511 U.S. at 677. The government need not "wait for speech actually to disrupt core operations before taking action." Moore v. City of Wynnewood, 57 F.3d 924, 934 (10th Cir. 1995).

In weighing the competing interests at stake, we must consider several factors. "[T]he manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." Rankin v. McPherson, 483 U.S. 378, 388 (1987). In addition, "pertinent considerations" include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Id.

7

We first address the time, place, manner, and context of Andersen's speech. Andersen made her comments on a televised news program. The story aired twice, and Andersen was identified as a Bonneville volunteer. Thus, Andersen commented publicly and, in doing so, appeared to speak for Bonneville and the DOC. Moore v. City of Wynnewood, 57 F.3d 924, 933 (10th Cir. 1995) ("[T]he government has a strong interest in controlling the speech of its employees when they purport to speak for the [state]."). Furthermore, Andersen had a strong personal interest in criticizing the proposed changes because she knew that her job was at stake.

Andersen's speech also had a detrimental impact on her relationships with her superiors and impeded her ability to perform her duties. Because Andersen assisted with Bonneville's therapy program, it was necessary for both the staff and the inmates to believe in her personal loyalty to the program. Once Andersen's interview aired, neither the staff nor the inmates could trust Andersen to keep confidential information from the public. Thus, Andersen severely damaged her Bonneville relationships, making it impossible for the staff and inmates to continue to work with her.

Finally, evidence at trial demonstrated that Andersen's speech posed a real threat to the effectiveness of Bonneville's treatment program and to the safety of Bonneville's staff and the public. Specifically, the evidence showed that inmates

8

have an irrational fear of any changes in their treatment regimen. When they believe dramatic changes are imminent, they may become angry and discouraged, leave the facility without authorization, or even re-offend. For these reasons, defendants hoped to prevent announcement of the proposed changes until the details of the policy change were finalized. After Andersen prematurely disclosed the proposed changes, several inmates expressed deep resentment and anger over her statement.

Thus, defendants appropriately decided to take swift remedial action based on their safety concerns. They tightened security at Bonneville to protect the staff and the public. In addition, they terminated Andersen based on a reasonable and good faith belief that her presence at the facility would impede the inmates' treatment and thereby further endanger the public.

Given the context of Andersen's speech, the impact of her comments on her Bonneville relationships, and the potential disruptiveness of her speech, we conclude that the Pickering balance tips in favor of defendants.[1] Andersen has failed to show that her interest in commenting on proposed changes to the

---

[1]Defendants argue, in part, that Andersen's speech is entitled to limited First Amendment protection because her comments were inaccurate. We recognize that "deliberately or recklessly false statements do not receive First Amendment protection." Dill, 155 F.3d at 1202. However, because we conclude on other grounds that defendants' interests outweigh plaintiff's interests, we need not decide whether Andersen's speech was intentionally or recklessly false.

9

Bonneville sex offender treatment program outweighed defendants' interest in efficiently and safely operating the program. Accordingly, we hold that Andersen's speech was not protected by the First Amendment. We therefore need not proceed further with the <u>Pickering</u> analysis.

AFFIRMED.