**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 26 2000**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JAMES A. WORRELL,

     Plaintiff-Appellant,

v.

GARY L. HENRY, in his official capacity as District Attorney of the Twentieth Judicial District for the State of Oklahoma, and in his individual capacity; WILLIAM FLOYD "DUB" TURNER, in his individual capacity; FRANK KEATING, in his official capacity as Governer of the State of Oklahoma; ELAINE DODD, in her individual capacity; and MALCOLM ATWOOD, in his individual capacity,

     Defendants-Appellees

No. 98-6219

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 96-CV-718-C)**

---

D. Gregory Bledsoe, Tulsa, Oklahoma, for Plaintiff-Appellant.

Lisa Tipping Davis, Assistant Attorney General, State of Oklahoma, for Defendant-Appellee Henry.

David Lee, Lee & Gooch, Oklahoma City, Oklahoma, (Scott Rowland, Oklahoma State Bureau of Narcotics and Dangerous Drugs, Oklahoma City, Oklahoma, with him on the brief) for Defendants-Appellees Turner, Dodd, and Atwood.

---

Before **HENRY** and **MURPHY** , Circuit Judges, and **KIMBALL,** District Judge. [*]

---

**HENRY** , Circuit Judge

---

James Worrell appeals the district court's grant of summary judgment against him and in favor of the defendants Gary Henry, William Floyd "Dub" Turner, Elaine Dodd, and Malcom Atwood on his claim alleging a violation of his First Amendment rights pursuant to 42 U.S.C. § 1983. In the district court proceedings, Mr. Worrell challenged Mr. Henry's withdrawal of an offer of employment to serve as the coordinator of a drug task force, administered by Mr. Henry in his capacity as District Attorney for the Twentieth District of Oklahoma. According to Mr. Worrell, Mr. Henry withdrew the offer because of information he received from the defendant Mr. Turner, an agent for the Oklahoma Bureau of Narcotics and Dangerous Drugs (OBNDD): Mr. Turner informed Mr. Henry that Mr. Worrell had testified as an expert witness for the defendant in a murder trial nine years earlier. Mr. Worrell maintained that the

---

[*] The Honorable Dale A. Kimball, United States District Judge for the District of Utah, sitting by designation.

withdrawal of the job offer constituted retaliation for activity protected by the First Amendment—truthful testimony in the murder trial.

Applying the balancing test first set forth by the Supreme Court in Pickering v. Board of Education, 391 U.S. 563 (1968), the district court rejected Mr. Worrell's argument. Noting that Mr. Henry had received information from Mr. Turner that law enforcement officers did not trust Mr. Worrell, the court concluded that Mr. Worrell's interest in testifying was outweighed by the defendants' interest in administering an effective drug task force.

For the reasons set forth below, we agree with the district court's resolution of the Pickering balancing test with regard to Mr. Henry. However, because the Pickering balancing test has not been applied to individuals who are neither the plaintiff's employer nor parties to a contract with him, we conclude that the district court erred in analyzing Mr. Worrell's claims against Mr. Turner, Ms. Dodd, and Mr. Atwood. As to those claims, we vacate the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.

I. BACKGROUND

In January 1986, attorneys representing the defendant in a capital murder case pending in the District Court of Woodward, Oklahoma asked Mr. Worrell to

3

testify at trial. [1] At the time, Mr. Worrell was employed as a private investigator, but he had previously worked as an FBI agent. The lawyers informed him that the case involved the killing of an undercover ONBDD agent who had tried to make an arrest. They explained that they were exploring a theory of self-defense: that the murdered ONBDD agent had attempted to arrest the defendant without displaying any indication of his official authority and that, as a result, the defendant could have reasonably believed that the agent was attempting to rob him.

Mr. Worrell agreed to testify as a paid expert. On January 30, 1986, he gave the following testimony on direct examination by the defendant's attorney:

> Q: As to the undercover arrest itself, are [sic] there any type of standard operating procedure, or basic fundamental course that is taught the officer as to how he is to go about identifying himself under those circumstances?
>
> A: Yes. Whoever is going to make the apprehension must have some form of identification to show that they are a law enforcement officer. They must either wear their badge, or they must be in uniform or they must have a jacket. In fact, the FBI have big black armbands with white letters on them in addition to their badge. But, they must have some identification so that the criminal will realize that you are a constituted authority when you make the arrest.
>
> . . . .

---

[1] The case was State v. Ellis, No. CRF-85-59, District Court of Woodward County, Oklahoma. See Aplt's App. at 313.

4

> Q: Why would it be necessary for an undercover officer to specifically show identification in addition to just saying that he is an officer?
>
> A: Because the criminal doesn't know unless he sees a symbol of authority. Anybody could hollar [sic] the words ["]police,["] and without the symbol of authority, the criminal can only assume that somebody is fixing to rip him off, take him down, and he doesn't know who that is.

Aplt's App. at 242, 245.

The prosecution offered testimony from a supervising special FBI agent to rebut Mr. Worrell's testimony. The FBI agent stated that proper arrest procedure required the law enforcement officer to identify himself as an agent but that he did not usually display a badge or other credentials. After hearing all the evidence, the jury convicted the defendant. However, it rejected the prosecution's request for the death penalty and imposed a sentence of life imprisonment.

Mr. Worrell's testimony in the Ellis case generated considerable anger and resentment among ONBDD agents. Some agents speculated that it was Mr. Worrell's testimony that kept the defendant from receiving the death penalty. Although Mr. Turner had not attended the trial and had not reviewed a transcript of Mr. Worrell's testimony, he heard from other agents that Mr. Worrell had testified that "the investigation was basically botched from the beginning . . . and . . . because of . . . the poor caliber of the investigators, this is what led to [the ONBDD agent's] murder." Id. at 111.

5

In 1994, Mr. Henry was elected District Attorney for the Twentieth Judicial District of Oklahoma. Mr. Worrell applied for an investigative position with Mr. Henry's office, and some time between January and March 1995, Mr. Henry offered Mr. Worrell the position of coordinator of the District Attorney's drug task force. Mr. Henry wanted the task force to handle informants and conduct undercover drug investigations. Mr. Henry informed Mr. Worrell that he had applied for a grant for the task force from the Violent Crime Grant Board and that the job offer was conditioned on the award of the grant. Mr. Worrell accepted the offer, and Mr. Henry submitted Mr. Worrell's résumé along with the grant application seeking funding for the task force.

Mr. Henry also discussed the drug task force with the defendant Mr. Turner, who was the ONBDD agent in charge of the Ardmore district. In their initial discussions, Mr. Turner offered the ONBDD's assistance to task force personnel. He thought that the task force was a "[t]remendous idea," id. at 115, and told Mr. Henry that ONBDD agents would assist in training task force employees and getting them admitted into educational programs for law enforcement agents.

Mr. Turner's view of the task force soon changed. Although he had heard that Mr. Henry had offered the coordinator position to Mr. Worrell, he had not initially recognized Mr. Worrell's name. In May or June of 1995, an FBI agent

6

informed Mr. Turner that Mr. Worrell was the agent who had testified for the defense in the Ellis case. Mr. Turner contacted his supervisors, the defendant Elaine Dodd (the ONBDD Director) and the defendant Malcom Atwood (the ONBDD agent-in-charge). He told them that he intended to withdraw his previous offers of ONBDD assistance if Mr. Henry hired Mr. Worrell. He explained that he believed that Mr. Worrell had been deceitful, that he did not trust him, and that he would not work with him. Ms. Dodd and Mr. Atwood informed Mr. Turner that he would not be required to work with someone whom he did not trust, and they agreed that he could talk to Mr. Henry about Mr. Worrell.

After speaking with Ms. Dodd and Mr. Atwood, Mr. Turner telephoned Mr. Henry. Mr. Henry summarized their conversation as follows:

> [H]e had found out that Mr. Worrell was one and the same individual who testified in a murder trial in Woodward County, I believe, regarding the murder of an OBN[DD] agent . . . , that he felt like Mr. Worrell had whored himself out to the defense and that he did not trust him and that he was agent in charge and that he was not going to work with any agency or anybody that he did not trust and he would not put his officers in a position of working with anyone he didn't trust and therefore, all offers, . . . were revoked if Mr. Worrell went to work for me.

Id. at 146.

After conferring with a colleague at the District Attorney's Council and an FBI agent, Mr. Henry decided to rescind the job offer he had made to Mr.

7

Worrell. In explaining his decision, he told Mr. Worrell that he was concerned not with the testimony in the Ellis case but rather with the fact that the ONBDD "was not going to cooperate or coordinate with the Task Force and that [he] felt that cooperation and coordination was essential." Id. at 149.

In deposition testimony, Mr. Henry further explained:

> [T]he grant that was awarded was only $90,000, about half of what we asked . . . . I would be able to hire two agents and help fund possibly a third. But without the cooperation, coordination, assistance, and training, intelligence from the Bureau of Narcotics, I didn't feel it would be a viable task force.
>
> . . . .
>
> The major brunt of our drug program in the 20th District Attorney's District is confined to the Ardmore area. When you're doing a Task Force, you don't want to hire as agents police officers that everybody in the whole part of the state knows are cops and then put them in the field doing undercover work. You need to bring in people who are new and outsiders.
> Bringing in individuals such as Mr. Worrell and others who came in and had no knowledge of the operations, no knowledge of the people, no knowledge of the drug community, who would then be thrown out there without any kind of cooperation or coordination from the one agency that specializes in that operation would be an impotent organization and would not be able to function.
>
> I was saddled with and was vested with the responsibility of tens and thousands of dollars of federal grant money that I wanted put into a viable operation and I was not going to have it put into something where you have two agents sitting in an office and waiting and hoping for the phone to ring, which is what would have been the

8

> situation had Mr. Worrell been there without the cooperation of these agencies, and I was not going to do that.

Id. at 148.

In March 1997, Mr. Worrell filed the instant action. He named Mr. Henry, Mr. Turner, Ms. Dodd, and Mr. Atwood as defendants and alleged that the recission of the offer to serve as coordinator of the drug task force violated his right to free speech under the First Amendment. He also asserted state law claims for intentional interference with contractual relations and slander.

After conducting discovery, the defendants moved for summary judgment. In March 1998, the district court granted the defendants' motion on Mr. Worrell's First Amendment claim and dismissed his state law claims without prejudice.

The court began its analysis by assuming that Mr. Henry's withdrawal of the job offer was based in part on Mr. Worrell's testimony in the Ellis case. It then applied the balancing test first set forth in Pickering v. Board of Education, 391 U.S. 563 (1968). The court cited evidence that Mr. Worrell's "presence would have had a detrimental impact on the working relationship between OBN[DD] and the task force" and that Mr. Henry believed that "without OBN[DD] cooperation, the drug task force would not be able to function." Id. at 325. In light of this evidence, it concluded that "[Mr. Worrell's] interest in exercising his first amendment rights nine years earlier is far outweighed by

9

Henry's interest in providing the citizens of the Twentieth District with an effective drug task force." Id. at 326. Thus, Mr. Worrell had failed to present a viable First Amendment claim.


## II. DISCUSSION


On appeal, Mr. Worrell first challenges the district court's application of the Pickering balancing to the defendant Mr. Henry. He maintains that the district court erred in finding Mr. Henry's interests in administering an effective drug task force outweighed Mr. Worrell's interest in providing truthful testimony. Next, Mr. Worrell challenges the district court's application of the Pickering balancing to the ONBDD defendants (Mr. Turner and his two supervisors, Ms. Dodd and Mr. Atwood). As to those defendants, Mr. Worrell argues that the fact that they were not his prospective employer and were not parties to a contract with him renders the Pickering approach inapplicable. Finally, in the event that we reverse the district court grant of summary judgment to the defendants, Mr. Worrell urges us to reject the defendants' contention that they are entitled to qualified immunity, even though the district court did not consider that question. He maintains that the interests of judicial economy support the resolution of the qualified immunity issue in this appeal.

We engage in de novo review of the district court's grant of summary judgment to the defendants, applying the same standard as the district court pursuant to Fed. R. Civ. P. 56. McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir.1998). Summary judgment is warranted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); Williams v. Widnall, 79 F.3d 1003, 1005 (10th Cir. 1996). We examine the record to determine whether any genuine issue of material fact is in dispute, construing the factual record and reasonable inferences therefrom in the light most favorable to the non-moving party. See Curtis v. Oklahoma City Pub. Schs. Bd. of Educ., 147 F.3d 1200, 1214 (10th Cir.1998). If there is no dispute concerning a genuine issue of material fact, we determine whether the district court correctly applied the substantive law. Peck v. Horrocks Eng'rs, Inc., 106 F.3d 949, 951 (10th Cir. 1997).

We begin our analysis by reviewing the protections provided to witnesses who testify at trial. We then apply the Pickering balancing to the defendant Mr. Henry. Next, we consider whether the Pickering approach should be applied to defendants (like Mr. Turner, Ms. Dodd, and Mr. Atwood) who are not the plaintiff's employer. Finally, we address the question of qualified immunity.

A. Protection of Witnesses' Testimony

11

In order to encourage truthful and uninhibited testimony, the law has long afforded certain protections to witnesses. Under the common law, witnesses were immune from suits for damages for testimony in judicial proceedings. <u>See</u> <u>Briscoe v. LaHue</u>, 460 U.S. 325, 331 (1983). The grant of immunity sought to forestall two kinds of self-censorship. First, absent immunity, witnesses might be reluctant to come forward. <u>See</u> <u>id.</u> at 333 (citing <u>Henderson v. Broomhead</u>, 157 Eng. Rep. 964, 968 (Ex. 1859)). Second, witnesses might distort their testimony out of fear of subsequent liability. The grant of immunity thus promoted full disclosure of the relevant facts:

> Even within the constraints of the witness's oath there may be various ways to give an account or to state an opinion. These alternatives may be more or less detailed and may differ in emphasis and certainty. A witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence. But the truth finding process is better served if the witness' testimony is submitted to the crucible of the judicial process so that the factfinder may consider it, after cross- examination, together with the other evidence in the case to determine where the truth lies.

<u>Briscoe</u>, 460 U.S. at 333-34 (internal citations and quotations omitted). Considering the common law tradition and Congressional intent, the Supreme Court has extended witness immunity to § 1983 actions. <u>See</u> <u>id.</u> at 345-46 (noting the "indispensable" role that witnesses play in the adjudicatory process).

12

In the last few decades, federal courts have afforded additional protection to witnesses who are employed by the government, concluding that truthful testimony is protected by the First Amendment and that a government employee may not be fired or subjected to other adverse action as a result of such testimony. See, e.g., Melton v. City Oklahoma City, 879 F.2d 706, 714 (10th Cir. 1989), vacated on other grounds, 928 F.2d 920 (10th Cir. 1991) (en banc)); see also Pro v. Donatucci, 81 F.3d 1283, 1291 (3d Cir. 1996); Smith v. Hightower, 693 F.2d 359, 368 (5th Cir. 1982). Those decisions are particular applications of the "modern 'unconstitutional conditions doctrine,' [which] holds that the government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." Board of County Comm'rs v. Umbehr, 518 U.S. 668, 674 (1996) (internal citations and quotations omitted); see also Andersen v. McCotter, 100 F.3d 723, 727 (10th Cir. 1996) (explaining the unconstitutional conditions doctrine and noting that "the Court has recognized a variety of benefits which cannot be denied solely because of the exercise of constitutional rights," including the offer of a government job).

The Fifth Circuit's decision in Johnston v. Harris County Flood Control Dist., 869 F.2d 1565 (5th Cir. 1989), provides an overview of the reasons for protecting government employees' testimony. Absent such protection, employers

13

seeking to silence truthful testimony could present employees with a difficult choice. "Employees could either testify truthfully and lose their jobs or could lie to the tribunal and protect their job security." Id. at 1578. Either choice would come at too high a price: "Those able to risk job security would suffer state-sponsored retaliation for speaking the truth before a body entrusted with the task of discovering the truth." Id. On the other hand, "[t]hose unwilling or unable to risk unemployment would scuttle our efforts to arrive at the truth." Id. Affording constitutional protection to the truthful testimony of public employees protects both employees' interest in free expression and the judicial system's interest in arriving at the truth. Id.; see also Smith, 693 F.2d at 368 (concluding that the "[F]irst [A]mendment protects the right to testify truthfully at trial" and that such protection is also supported by "the right of a defendant at trial to compulsory process and the goal of our criminal justice system to arrive at the truth").

Nevertheless, First Amendment protection of public employees' testimony is not absolute. There are instances in which government entities' interests as employers outweigh employees' interests in free expression and the policy of encouraging truthful and uninhibited testimony. See Waters v. Churchill, 511 U.S. 661, 674-75 (1994) (plurality opinion) ("When [an employee] . . . begins to do or say things that detract from the agency's effective operation, the government must have some power to restrain [him]."); Tedder v. Norman, 167

14

F.3d 1213, 1215 (8th Cir. 1999) (concluding that employer's interest in avoiding disruption in the workplace outweighed employee's interest in giving voluntary testimony); Green v. Philadelphia Housing Auth., 105 F.3d 882, 887-89 (3d Cir. 1997) (same). A public employee's testimony may impair discipline by supervisors or harmony among coworkers; it may undermine close working relationships based on loyalty and confidence; it may impede the performance of an employee's duties or the regular operations of the enterprise. See Rankin v. McPherson, 483 U.S. 378, 388 (1987); Lytle v. City of Haysville, 138 F.3d 857, 863-64 (10th Cir. 1998).

In order to assess these various concerns, courts undertake a four-part inquiry. See Lytle, 138 F.3d at 863; see also Connick v. Myers, 461 U.S. 138, 142 (1983). First, one considers whether the speech in question addresses a matter of public concern. See Connick, 461 U.S. at 145-49. Only matters of public concern, "those of interest to the community, whether for social, political, or other reasons," Lytle, 138 F.3d at 863, are protected by the First Amendment in this context. Second, one considers the employee's interest in freedom of expression and the "government employer's interest in regulating the speech" of employees in order to maintain an efficient workplace. Id.; see Pickering, 391 U.S. at 568 (1968). Employee speech is protected only if the employee's interest in free expression outweighs the employer's interest in restricting the speech. See Lytle,

15

138 F.3d at 863. This weighing of interests is known as "the Pickering balancing." Third, if the speech is protected, the employee must show that the speech was "a substantial or motivating factor" in the challenged governmental action. Id.; see Gardetto v. Mason, 100 F.3d 803, 811 (10th Cir. 1996). Fourth, if the employee meets this burden, the employer must be given the opportunity to show that it would have taken the same action against the employee even in the absence of protected speech. See Gardetto, 100 F.3d at 811; (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

In this case, the parties agree that Mr. Worrell's testimony, which concerned proper arrest procedures, addressed a matter of public concern. See Lytle, 138 F.3d at 863 (concluding that testimony about proper police procedures involves a matter of public concern). Moreover, because the district court concluded that Mr. Worrell's testimony was not protected speech, it did not reach the third or fourth parts of the inquiry. Accordingly, we focus on the second part of the inquiry—the Pickering balancing. We begin with a review of our precedent concerning First Amendment retaliation claims involving the testimony of law enforcement agents and then compare it to decisions in other circuits.

In Melton v. City of Oklahoma City, 879 F.2d at 714-15, we applied the Pickering analysis to a police officer's claim that he had been wrongfully discharged for testifying on behalf of a judge who was the defendant in a criminal

16

case. We acknowledged that, if the testifying officer's colleagues disagreed with him as to the propriety of his testimony, then the officer's testimony might cause disharmony in the workplace. The testimony might also damage close working relationships depending upon loyalty and confidence. However, we added that "truthful trial testimony is unlikely to impair discipline by immediate superiors, interfere with the regular operation of the enterprise or impede the officer's performance of his daily duties." Id. at 714. Significantly, we found the police officer's interest in testifying at trial "compelling." Id. at 715. Accordingly, "any disruption or impairment of the enterprise would have to be extreme in order to justify preventing trial testimony." Id. (emphasis added). Because the municipality offered no evidence that the testimony affected the operations of the department, we concluded that the officer's First Amendment interest in testifying "easily outweigh[ed]" the municipality's interest in preserving the efficiency and effectiveness of its police department. Id.

In somewhat similar circumstances, other circuits have resolved the Pickering balancing differently. For example, in Green, 105 F.3d at 885, the Third Circuit rejected the plaintiff police officer's First Amendment challenge to his transfer out of a drug enforcement task force because he had agreed to testify as a character witness at a bail hearing for the son of a friend. The Third Circuit concluded that the police officer's interest in testifying was entitled to less weight

17

because he had appeared voluntarily. In contrast, the court characterized the interests of the police department as "very significant." Green, 105 F.3d at 888. "They include successfully fighting drugs and crime, protecting the safety of its officers and other members of the community, fostering trust and confidence among its officers and between its officers and other law enforcement drug units, and protecting the Housing Authority Police Department's reputation." Id. The court cited testimony that the police officer's voluntary appearance had impaired his ability to work with his fellow officers. Because of the kind of work performed by the drug task force, "any perceived breach of trust and security could reasonably constitute a threat to the [task force], its officers, and its relationships with other police drug units and the community it serves." Id. at 889. The court concluded that the risk of injury to the police department outweighed the officer's interest in providing voluntary testimony and that, as a result, his transfer out of the task force did not violate the First Amendment.

Similarly, in Tedder, 167 F.3d at 1215, the Eighth Circuit rejected a First Amendment challenge to the demotion of a deputy director of a state law enforcement training agency who had given voluntary deposition testimony that a deputy sheriff had used excessive force. The court resolved the Pickering balancing in favor of the employer, reasoning that the voluntary testimony substantially undermined the relationship between the plaintiff and his supervisor,

that the supervisor reasonably believed that the testimony was provided in violation of an agency policy, and that the testimony could disrupt the employer's relationships with the other law enforcement agencies.      See id.

Melton , Green , and Tedder illustrate the case-specific nature of the Pickering balancing as applied to public employees' testimony.  In stating that the disruption of the workplace must be "extreme" in order to outweigh the employee's interest in giving truthful testimony,      Melton imposes a somewhat higher burden on employers than the decisions of other circuits.

### B.  The Pickering Balancing Applied to the Defendant Mr. Henry (The Plaintiff's Prospective Employer)

In this appeal, Mr. Worrell argues that the district court erred in assessing the degree of disruption of the drug agency task force that would have resulted if Mr. Henry had hired him.  He therefore maintains that his testimony in the      Ellis case was protected by the First Amendment and that Mr. Henry improperly withdrew his offer to serve as the coordinator of the drug task force.

Before assessing Mr. Worrell's challenge to the district court's      Pickering balancing,  we must consider his status as a prospective employee.  In his appellate brief, Mr. Henry suggests that because Mr. Worrell was not ultimately employed by him and because the subject testimony was given nine years earlier (when Mr. Worrell was a private investigator), the case law concerning the First

Amendment rights of public employees is inapplicable. We are not persuaded by this argument.

This circuit has applied the Pickering balancing to hiring decisions. See Franklin v. Atkins, 562 F.2d 1188, 1190 (10th Cir. 1977) ("[T]he Regents need give no reason for a refusal to hire, and in fact need have no reason at all. However, it is equally obvious that they could not refuse to hire for a constitutionally impermissible reason.") (citation omitted). Other circuits have taken the same approach. See Shahar v. Bowers, 114 F.3d 1097, 1102-03 (11th Cir. 1997) (en banc) (applying Pickering balancing to government employer's withdrawal of a job offer); Hubbard v. EPA, 949 F.2d 453, 460 (D.C. Cir.1992) (applying the Pickering balancing to a hiring decision and observing that "[m]erely because an employer is hiring rather than firing, however, does not justify unconstitutional action").

These decisions are applicable here. When Mr. Henry decided to withdraw his offer to Mr. Worrell, he acted as an employer responsible for the functioning of the drug task force. Accordingly, we conclude that the Pickering balancing provides the appropriate framework for assessing the parties' interests and determining whether Mr. Henry violated Mr. Worrell's First Amendment rights.

Mr. Worrell's challenge to the district court's assessment of workplace disruption under Pickering is based on a distinction between internal and external

20

operations. He maintains that the evidence submitted by the defendants concerned only the disruption of the drug task force's external operations—its relationships with other law enforcement agencies. According to Mr. Worrell, only the disruption of an agency's internal operations may be considered in conducting the Pickering balancing.

Mr. Worrell's argument derives from our decision in Flanagan v. Munger, 890 F.2d 1557 (10th Cir. 1989). In that case, we considered a police chief's reasons for prohibiting officers from renting sexually explicit films: "if members of the public knew that officers were renting them, negative public feelings about the distribution of sexually explicit films would erode the public's respect and confidence in the police department." Flanagan, 890 F.2d at 1566. We noted that the police department had failed to produce any evidence of actual or potential disruption of the department's internal operations—because of discipline problems, disharmony, threats to working relationships, or problems with work performance. See id. In that circumstance, we concluded that the disruption of the department's external operations that might result because members of the public were offended could not justify the challenged disciplinary action against the police officers.

Flanagan is distinguishable from this case. Here, Mr. Henry presented evidence that the effective functioning of the drug task force depended upon "the

cooperation, coordination, assistance, training, [and] intelligence" of the ONBDD. Aplt's App. at 148.  With the support of his supervisors, Mr. Turner informed Mr. Henry that he intended to withdraw that cooperation if Mr. Worrell became the coordinator.  Mr. Worrell did not present any evidence to rebut Mr. Henry's contention that the task force would be jeopardized.  This case thus contains the very kind of evidence lacking in Flanagan .

Moreover, our prior decisions have acknowledged the appropriateness of Mr. Henry's concerns about Mr. Worrell's relationships with other law enforcement officers.  In particular, we have recognized that personal loyalty and confidence among employees are especially important in law enforcement.  See Lytle , 138 F.3d at 867;  Moore v. City of Wynnewood , 57 F.3d 924, 934 (10th Cir. 1995);  Wulf v. City of Wichita , 883 F.2d 842, 861 (10th Cir. 1989).  These concerns are heightened in smaller offices and departments, where relatively minor disturbances in morale may create significant problems.  Lytle , 138 F.3d at 867; Moore , 57 F.3d at 934.  Mr. Henry explained that his staff was small and that the presence of a coordinator with whom other officers would not work would have rendered the task force ineffective.

We further note that the unusual and unfortunate circumstances of this case heightened the disruption that might reasonably have resulted from the hiring of Mr. Worrell.  In the drug task force position, Mr. Worrell would have been

22

required to work closely with an agency (the ONBDD) that had employed the murder victim in the _Ellis_ case. Mr. Turner reported, "[T]here were many law enforcement officers who greatly resented Mr. Worrell for what he did, and who would have refused to work for him." Aplt's App. at 102. Although it may well be, as Mr. Worrell suggests in his appellate brief, that these officers' reactions to Mr. Worrell represented a kind of displaced anger over the murder and the failure of the prosecution to obtain a death sentence, _see_ Aplt's Br. at 11, Mr. Henry was entitled to consider the fact that these officers would not cooperate with Mr. Worrell in deciding whether to hire him.

Additionally, as Mr. Worrell's prospective employer, Mr. Henry was not obligated to wait for an actual breakdown in the functioning of the task force before taking action. Instead, he was entitled to rely on reasonable predictions of workplace disruption. _See_ Jantzen v. Hawkins, 188 F.3d 1247, 1258 (10th Cir. 1999). Mr. Henry's statement that the task force could not function effectively if Mr. Worrell were hired is not the sort of "purely speculative allegation[]" that we have condemned. _See_ Moore, 57 F.3d at 934; _see also_ Cragg v. City of Osawatomie, Kan., 143 F.3d 1343, 1347 (10th Cir. 1998). Instead, Mr. Henry's statement was based on a specific assessment of the cooperation needed in order for the drug task force to serve its purpose.

In acknowledging Mr. Henry's interest in administering an effective drug

23

task force, we do not minimize the importance of Mr. Worrell's First Amendment interest in providing testimony in the Ellis case. In reviewing the district court's grant of summary judgment, we must presume that testimony to be truthful. See Curtis, 147 F.3d at 1214 (noting that the court must construe the record in the light most favorable to the nonmoving party in reviewing the grant of a summary judgment motion). Acting as a private citizen, Mr. Worrell had a First Amendment right to express his opinion about proper arrest procedures. "[T]he goal of our criminal justice system to arrive at the truth," Smith, 693 F.2d at 368, and the interests of the parties in the case are furthered by witnesses who provide testimony to assist the trier of fact. Mr. Worrell's testimony is thus entitled to "heightened" protection under our precedent. See Lytle 138 F.3d at 867; Melton, 879 F.2d at 714. [2]

---

[2] Throughout this case, the defendants have noted that Mr. Worrell was not subpoenaed to testify at the Ellis trial and that he appeared voluntarily as a paid expert witness. They have argued that these facts indicate that Mr. Worrell's testimony is entitled to less protection under the Pickering inquiry. Although the Eighth Circuit has considered the voluntariness of testimony as one factor diminishing the employee's First Amendment interests, see Tedder, 167 F.3d at 1215, we need not address the significance of that factor here. Mr. Henry presented evidence concerning the extreme disruption of the task force that would have resulted from the hiring of Mr. Worrell. As a result, Mr. Henry's interests as an employer outweigh Mr. Worrell's interests in testifying in the Ellis case— even without any diminishment of Mr. Worrell's interests because he testified as a paid expert.

We do note that the Fifth Circuit has acknowledged the significant First Amendment protection afforded expert testimony in a case involving University of Texas faculty members. See Hoover v. Morales, 164 F.3d 221, 226 (5th Cir.

Nevertheless, those interests did not require Mr. Henry to hire a drug task force coordinator who could not obtain the necessary cooperation from other law enforcement officers. In these circumstances, Mr. Henry has established the degree of extreme disruption, see Melton, 879 F.2d at 714, in law enforcement operations necessary to outweigh Mr. Worrell's interest in testifying at the Ellis trial. We, therefore, conclude that the district court properly granted summary judgment to Mr. Henry on Mr. Worrell's First Amendment claim.

C.. The Nonemployer Defendants (Turner, Dodd, and Atwood)

Our conclusion that the district court properly applied the Pickering balancing to the defendant Mr. Henry does not necessarily resolve Mr. Worrell's First Amendment claim against the defendants Mr. Turner, Ms. Dodd, and Mr. Atwood. Those defendants all worked for the ONBDD, and, as they acknowledge in their appellate brief, they were not Mr. Worrell's prospective employer. They

---

1998). That case concerned policies barring state employees from acting as consultants or witnesses on behalf of parties opposing the state in litigation. Applying Pickering, the court held that an employee's interest in giving testimony outweighed the state's interest as an employer. See id. ("In this case, the State has not identified how the State's interest in promoting efficiency of the public services it performs through its employees will be adversely affected by allowing state employees to serve as or be retained as expert witnesses or consultants.").

25

also had no direct contractual relationship with him.

1.  Pickering and Nonemployer Defendants

As the parties observe, the <u>Pickering</u> balancing has been most frequently applied to adverse actions taken by employers—individuals like Mr. Henry who have the authority to make hiring and firing decisions and take other personnel actions. <u>See, e.g.</u>, <u>Rankin</u>, 483 U.S. at 388-92 (applying balancing approach to claim against constable for firing deputy constable); <u>Pickering</u>, 391 U.S. at 568-73 (applying the balancing approach to claim against a School Board that dismissed a teacher); <u>Jantzen v. Hawkins</u>, 188 F.3d at 1247, 1256-58 (10th Cir. 1999) (applying balancing approach to claim against a sheriff who fired a deputy); <u>Prager v. LaFaver</u>, 180 F.3d 1185, 1191 (10th Cir.) (applying the balancing appoach to claim against Secretary of a state Department of Revenue who fired a senior tax attorney), <u>cert. denied</u>, 120 S. Ct. 404 (1999). Although courts have occasionally applied the <u>Pickering</u> approach outside the employment setting, those decisions have typically involved some kind of contractual relationship between the plaintiff and the defendant. <u>See, e.g</u>, <u>Umbehr</u>, 518 U.S. at 673-86 (applying the <u>Pickering</u> balancing to First Amendment claim by an independent contractor); <u>Copsey v. Swearingen</u> 36 F.3d 1336, 1343-45 (5th Cir. 1994) (applying <u>Pickering</u> to the termination of a vendor's license); <u>Davis v. West Community Hosp.</u>, 755

26

F.2d 455, 461-62 (5th Cir. 1985) (applying Pickering to hospital's termination of surgeon's staff privileges).

As the plurality explained in Waters v. Churchill, it is the government's powers and responsibilities as an employer that warrant restrictions on speech that would not be justified in other contexts:

> The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as a sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

Waters, 511 U.S. at 675 (emphasis added). Similarly, when the government acts as a contractor, "its interests as a public service provider, including its interest in being free from intensive judicial supervision of its daily management functions, are potentially implicated." Umbehr, 518 U.S. at 678.

In this case, although Mr. Henry wanted the coordinator of the District Attorney's drug task force to work closely with ONBDD agents, the ONBDD did not employ the coordinator. The authority to reestablish the task force, to seek funding for it, to hire Mr. Worrell and then to rescind that offer of employment belonged to Mr. Henry, not the ONBDD defendants. The evidence submitted by the ONBDD defendants indicates that they, like Mr. Henry, were concerned about

27

providing effective law enforcement. However, the functioning of the drug task force was Mr. Henry's responsibility.

In instances in which a public employee alleges that an official outside the employing agency has engaged in retaliatory conduct, there are serious risks in applying the Pickering approach to define the scope of the employee's First Amendment rights. Our decision in Flanagan, 890 F.2d at 1566-67, suggests one such risk. There, we referred to the Supreme Court's rejection of "a heckler's veto" in First Amendment cases. Id. We concluded that a police department could not justify disciplinary action against the plaintiff police officers simply because some members of the public found the officers' speech offensive and, therefore, might not cooperate with the police department in the future. See id.

Applying Pickering to public officials outside the employing agency and not parties to a contract with the plaintiff would raise the possibility of an analogous kind of veto—a veto over personnel or contractual decisions. In particular, acting with retaliatory intent, a third party upon whose cooperation the employer depended could refuse to cooperate with the employer unless a particular employee were fired, demoted, or transferred. By withholding cooperation, the third party could effectively create the very workplace disruption that, under the Pickering approach, could be used to justify the limitation of First Amendment rights. Cf. Hughes v. Whitmer, 714 F.2d 1407, 1434 (8th Cir. 1983)

28

(McMillian, J., dissenting) (concluding that "[i]t would be anserine to permit the government to discipline its employees because of disruption caused by the government's repressive reaction to the employee's first amendment activities").

Moreover, employer defendants like Mr. Henry and third party defendants like the ONBDD agents may have very different relationships to the speech-engendered workplace disruption that is often central to the Pickering analysis. An employer defendant responsible for managing the workplace will often have first-hand knowledge of the degree of disruption caused by the plaintiff's speech and its effects on the functioning of the agency. See Waters, 511 U.S. at 673 (noting the "substantial weight [afforded to] government employers' reasonable predictions of disruption"). Additionally, employer defendants will often be unable to avoid that disruption. In contrast, a nonemployer defendant, although able to cause disruption by refusing to cooperate with the plaintiff's employer unless certain personnel action is taken, may have little first-hand knowledge about how the protected speech will affect the functioning of the employing agency. Because a nonemployer defendant works for another agency, he or she may be able to avoid the effects of the disruption caused by the withdrawal of cooperation.

These differences are illustrated by the contrast in the evidence submitted by Mr. Henry and the ONBDD defendants regarding the effects of hiring Mr.

Worrell for the drug task force position. As we have noted, Mr. Henry made a compelling case concerning the disruptive effect that such a hiring decision would have had on the drug task force. He pointed to the fact that his small and underfunded drug task force depended on the cooperation of ONBDD agents and thus could not function with a coordinator (like Mr. Worrell) with whom the ONBDD agents would not work. In contrast, Mr. Turner (who was not personally responsible for the operation of the task force) did not testify as to the effect that Mr. Worrell would have had on the task force itself. Instead, Mr. Turner stated that "I could not trust [Mr. Worrell] and did not and do not believe that my agency could effectively carry out our mission of enforcing drug laws and carrying out undercover operations if Mr. Worrell had been the Task Force Director." Aplt's App. at 101. That statement is open to some debate. The record indicates that the task force had not existed for several years before Mr. Henry's election as District Attorney, and there is no indication that the ONBDD's operations were adversely affected during that period. Moreover Mr. Turner's threat to withdraw the offer to cooperate with the task force appears to be based on the assumption that the ONBDD could function independently of the task force. Because the ONBDD defendants did not themselves employ Mr. Worrell they were unable to present the persuasive evidence of workplace disruption that Mr. Henry presented.

In distinguishing third party agencies from employers and contractors, we do not intend to discount the important interests noted by the ONBDD in this case. We agree with the ONBDD defendants that their agency has a strong interest in providing effective law enforcement. It is certainly conceivable that an outside agency's hiring of a person whom ONBDD agents did not trust could have a detrimental effect on ONBDD operations. Nevertheless, under the Oklahoma law outlined by the parties, none of the ONBDD defendants had any authority over personnel decisions made by the District Attorney about the drug task force. When Mr. Turner spoke with Mr. Henry about Mr. Worrell, he therefore acted neither as an employer nor as a contractor. Moreover, as discussed below, there is a factual dispute as to whether Mr. Turner acted with retaliatory intent. To equate the ONBDD's interests in these circumstances with the interests of agencies that possess the authority of an employer or contracting party would extend the  Pickering  approach beyond the limits that our precedent has recognized. [3]

---

[3]  We acknowledge that there may be instances in which the operations of a third party agency are so intertwined with the operations of the employing agency that the  Pickering  balancing should be applied. In other contexts, courts have held that one company or agency may be held liable for another company or agency's wrongful conduct if the companies or agencies constitute a "single employer."  See  Knowlton v. Teltrust Phones, Inc.  , 189 F.3d 1177, 1184 (10th Cir. 1999) (applying the single-employer test);  Lockard v. Pizza Hut, Inc.  , 162 F.3d 1062, 1070 (10th Cir. 1998) (same). "The single-employer test rests on four factors: (1) interrelation of operations; (2) centralized control over labor

2. A Framework for Analyzing First Amendment Claims Against Nonemployer Defendants

Accordingly, we conclude that an alternative to the Pickering balancing is warranted when allegations of retaliatory conduct are directed at a defendant who is not the plaintiff's employer and when there is no contractual relationship between them. The Eighth Circuit's decision in Helvey v. City of Maplewood, 154 F.3d 841 (8th Cir. 1998), suggests such an approach.

In Helvey, the plaintiff alleged that, after she testified about an incident involving municipal police officers, the city manager demanded that she be fired from her job as a bartender. According to the plaintiff, her employer complied with the city manager's request. Without applying the Pickering balancing, the Eighth Circuit reversed the grant of summary judgment to the city manager,

---

relations; (3) common management; and (4) common ownership or financial control."
Knowlton, 189 F.3d at 1184. "[T]he heart of the inquiry is whether there is an absence of an arms-length relationship among the companies." Id. Although this test has been most frequently applied to private companies, some courts have adopted a similar approach with regard to government agencies. See E.E.O.C. v. State of Illinois, 69 F.3d 167,171-72 (7th Cir.1995) (rejecting allegation that "the State of Illinois so extensively controls the employment of teachers by the local school districts that are their nominal employers so as to be the real . . . employer").
        Here, the ONBDD defendants have not argued that the operations of the District Attorney's office and the ONBDD were so intertwined that they should be considered a single employer. Accordingly, we need not decide whether a "single employer" approach may be applied such that nonemployer defendants may be afforded the benefit of the Pickering balancing.

concluding that there were controverted factual issues as to the city manager's intent. The court concluded, "[The plaintiff's] allegation that [the city manager] used his position of authority to cause [the employer] to fire her in retaliation for the testimony she gave concerning the incident involving [the police officers] stated a claim under section 1983." Helvey, 154 F.3d at 844.

The Eighth Circuit's approach in Helvey resembles one we have adopted in assessing First Amendment retaliation claims against defendants other than the plaintiff's employer. We have stated that "[a]ny form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." Lackey v. County of Bernalillo, No. 97-2265, 1999 WL 2461, at **3 (10th Cir. Jan. 5, 1999). We have required proof of the following elements: (1) that the plaintiff "was engaged in constitutionally protected activity"; (2) that the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) that the "defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." Id. That approach has been followed by other circuits. See, e.g., Mendocino Environmental Center v. Mendocino County, 192 F.3d 1283, 1300-01 (9th Cir. 1999); Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir. 1998).

33

In our view, this approach, rather than the _Pickering_ balancing, provides the appropriate framework for assessing First Amendment claims against a defendant who is neither an employer nor a party to a contract with the plaintiff. By focusing on the protected activity, the effect of the defendant's actions, and the defendant's intent, this approach reduces the risk of infringement of protected speech that might result from application of the _Pickering_ balancing. Under this approach, a defendant who acts with retaliatory intent to cause an employer to take adverse action will not be able to invoke workplace disruption caused by his or her own conduct to justify the infringement of protected speech. On the other hand, if the defendant's intent in urging adverse action against the employee is not retaliatory (e.g., if the defendant identifies legitimate problems with employee's qualifications or performance) or if the defendant's conduct did not cause the adverse action, then the defendant may successfully defend the retaliation claim. Thus, under this approach, defendants such as the ONBDD officials here may still invoke their interest in providing effective law enforcement: if they can show that their motive in allegedly causing the rescinding of the plaintiff's job offer was to ensure that the ONBDD could function effectively (rather than to retaliate against the plaintiff for his testimony), then they may defeat the plaintiff's First Amendment retaliation claim.

34

We now apply this framework to Mr. Worrell's claims against the ONBDD defendants. Viewing the record in the light most favorable to Mr. Worrell, we first consider the claim against Mr. Turner and then proceed to the claims against his two supervisors, Ms. Dodd and Mr. Atwood.

### 3. Claim Against the Defendant Turner

With regard to the claim against Mr. Turner, we conclude that a reasonable factfinder could find for the plaintiff Mr. Worrell on the first element—that Mr. Worrell was engaged in constitutionally protected activity. We have noted above that truthful testimony is protected by the First Amendment. See Melton, 879 F.2d at 714; Lytle, 138 F.3d at 864 n.2. Although Mr. Henry and the ONBDD defendants dispute the truthfulness of Mr. Worrell's testimony, we must afford him the benefit of all favorable inferences. See Curtis, 147 F.3d at 1214. Thus, a reasonable factfinder could conclude that, by testifying in the Ellis trial, Mr. Worrell engaged in constitutionally protected activity.

As to the second element, a factfinder could conclude that Mr. Turner caused Mr. Worrell "an injury that would chill a person of ordinary firmness from continuing to engage in that activity." Lackey, 1999 WL 2451, at **3. There is evidence in the record supporting the conclusion that Mr. Turner caused the withdrawal of a job offer by refusing to cooperate with the fledgling task force if

Mr. Henry hired Mr. Worrell. Moreover, a factfinder could conclude that Mr. Turner's statements that Mr. Worrell was not trusted by a significant section of the law enforcement community could adversely affect Mr. Worrell's ability to obtain other positions. The loss of a job and the adverse impact on Mr. Worrell's career prospects are sufficient to establish the second element of the retaliation claim against Mr. Turner. See Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000) (concluding that decisions relating to promotion, transfer, and hiring constitute sufficiently adverse actions to trigger First Amendment protections).

As to the third element (whether "[Mr. Turner's action] was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct," see Lackey, 1999 WL 2451, at *3 ), there is evidence in the record from which a reasonable factfinder could find retaliatory motive. In particular, Mr. Turner informed Mr. Henry that, because of the Ellis testimony (which we must here assume to be truthful and, therefore, protected by the First Amendment), he would not cooperate with Mr. Worrell. Although the ONBDD defendants argue that there were other reasons for the negative assessment of Mr. Worrell, there is a factual question as to Mr. Turner's motive.

We emphasize that Mr. Turner may be able to rebut Mr. Worrell's contentions at trial. For example, he may be able to convince the trier of fact that

36

Mr. Worrell's testimony in the Ellis case was not truthful, that his actions were motivated by a good faith belief that Mr. Worrell's hiring would have an extreme detrimental effect on ONBDD operations, or that his negative assessment of Mr. Worrell was supported by factors other than the testimony. However, because the record contains evidence from which a factfinder could conclude that Mr. Worrell has established each of the three elements of his retaliation claim against Mr. Turner, we conclude that the district court erred in granting summary judgment in favor of Mr. Turner on Mr. Worrell's First Amendment claim. [4]

### 4. Claims against the Defendants Dodd and Atwood

With regard to the two other ONBDD defendants, the record is less developed. The evidence presented by the parties on summary judgment indicates that Mr. Turner informed Ms. Dodd and Mr. Atwood of his plan to talk to Mr. Henry about the decision to hire Mr. Worrell and that the two supervisors approved this course of action. In their affidavits, Ms. Dodd and Mr. Atwood

---

[4] At first glance, it may seem counterintuitive that Mr. Worrell has a viable First Amendment claim against the ONBDD defendants, but not against Mr. Henry. However, a similar distinction between defendants is sometimes made in the analogous tort action of intentional interference with contract. In particular, an at-will employee who has no wrongful termination action against his employer may still be able to assert an intentional interference claim against a third party. See Haddle v. Garrison, 119 S. Ct. 489, 492 (1998).

37

explain that they told Mr. Turner that they believed that he should not be forced to work with people whom he did not trust.

Under § 1983, a defendant may not be held liable under a theory of respondeat superior. See Gagan v. Norton, 35 F.3d 1473, 1476 n.4 (10th Cir. 1994). Instead, to establish supervisory liability, a plaintiff must show that "an affirmative link exists between the [constitutional] deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir. 1988) (quotation omitted) (alternation in original). However, in this case, neither the parties nor the district court have distinguished the roles played by each of the ONBDD defendants from the role played by Mr. Henry. More specifically, neither the parties nor the district court have addressed the question of whether Ms. Dodd's and Mr. Atwood's approval of Mr. Turner's talking to Mr. Henry about Mr. Worrell constituted sufficient personal participation in the alleged retaliation to support a § 1983 claim against them. Additionally, the record contains little factual detail as to these two supervisors' involvement in the challenged actions.

Accordingly, we conclude that the resolution of the question of Ms. Dodd's and Mr. Atwood's liability, if any, under the retaliation framework set forth above requires further development of the record and an opportunity by the parties to

38

present their arguments. We, therefore, leave it to the district court to resolve the First Amendment claims against Ms. Dodd and Mr. Atwood upon remand.


### D.  Qualified Immunity (of Defendant Turner)

Finally, Mr. Worrell requests this court to address the issue of qualified immunity.  He notes that all of the defendants raised the defense of qualified immunity in their summary judgment motions but that the district court, in ruling on the merits, did not address that defense.  Mr. Worrell contends that, in the event that we reverse summary judgment as to one or more of the defendants, the interests of judicial economy indicate that we should address the issue of qualified immunity in this appeal rather than allowing the defendants to reassert the defense on remand.

Our precedent allows us to reach the qualified immunity issue if the parties have had an adequate opportunity to advance their arguments.    See Andersen , 100 F.3d at 729 ("Because both parties fully argued the issue of qualified immunity before the district court and on appeal, and because we find that the proper resolution of this issue is apparent, we will consider this legal question.").  Here, the defendants raised the issue of qualified immunity in their summary judgment motions.  However, because we have ruled in favor of the defendant Henry on the

39

merits and because we are remanding the claims against Ms. Dodd and Mr. Atwood for further development, we will address only the defendant Mr. Turner's qualified immunity claim.

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Ramirez v. Oklahoma Dept. of Mental Health, 41 F.3d 584, 592-93 (10th Cir. 1994) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); see also Workman v. Jordan, 958 F.2d 332, 336 (10th Cir. 1992) ("If [defendants'] actions are those that a reasonable person could have believed were lawful, defendants are entitled to dismissal before discovery."). In order for a right to be "clearly established" for purposes of assessing entitlement to qualified immunity:

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citations omitted).

Here, Mr. Worrell has alleged that Mr. Turner violated his First Amendment right to testify at trial. Decisions of this circuit have held that the

right to testify truthfully is clearly established. Langley v. Adams County, Colo. , 987 F.2d 1473, 1479 (10th Cir. 1993) ("The law is clearly established that the 'First Amendment protects the right to testify truthfully at trial.'") (quoting Melton , 879 F.2d at 714); see also Lytle , 138 F.3d at 864 n.2 (recognizing the heightened protection afforded trial testimony). As we have noted, we must here afford Mr. Worrell the benefit of the favorable inference that his testimony was truthful.

Although decisions applying the Pickering balancing have concluded that an employer's interests may sometimes outweigh the employee's First Amendment interest in providing truthful testimony, Mr. Turner has identified no controlling authority applying the Pickering approach to the conduct of a third party who is not the plaintiff's employer or prospective employer and who is not a party to a contract with him. As set forth above, absent such authority, Mr. Turner's conduct should be assessed under the framework regarding allegations of retaliation outside the employment context.

Under that framework, the defendant's intent is the key element. "'An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper.'" See DeLoach v. Bevers , 922 F.2d 618, 620 (10th Cir. 1990) (quoting Matzker v. Herr , 748 F.2d 1142, 1150 (7th Cir. 1984)). Moreover, "[t]he

41

unlawful intent inherent in such a retaliatory action places it beyond the scope of [an official's] qualified immunity if the right retaliated against was clearly established." DeLoach , 922 F.2d at 620.

As explained above, viewing the evidence in the light most favorable to Mr. Worrell, a trier of fact could conclude that Mr. Turner acted in retaliation for Mr. Worrell's truthful trial testimony when he advised Mr. Henry that he would not cooperate with the drug task force if Mr. Worrell was the coordinator. Because the right to testify truthfully is clearly established, see Lytle , 138 F.3d at 864 n.2; Langley , 987 F.2d at 1479; Melton , 879 F.2d at 714, Mr. Turner is not entitled to qualified immunity on this record.

## III. CONCLUSION

For the reasons set forth above, we conclude that the district court properly granted summary judgment in favor of the defendant Mr. Henry on the plaintiff Mr. Worrell's First Amendment claim. However, the district court erred in granting summary judgment to the defendants Mr. Turner, Ms Dodd, and Mr. Atwood. On this record, Mr. Turner is not entitled to qualified immunity on Mr. Worrell's First Amendment claim.

Accordingly, the district court's order is AFFIRMED in part, VACATED in part, and REMANDED for proceedings consistent with this opinion.

42