**Lewis CAIN, Vicki Cain, and Joshua Cain, Plaintiffs,**

v.

**TIGARD–TUALATIN SCHOOL DISTRICT 23J, Frank Geske, and John Does 1–10, Defendants.**

**No. CIV. 01–1278–HU.**

United States District Court, D. Oregon.

Jan. 8, 2003.

Michael R. Seidl, Seidl Law Office, Portland, for Plaintiffs.

Karen M. Vickers, Bullivant Houser Bailey, Portland, for Defendant Tigard–Tualatin School District 23J.

Peter R. Mersereau, Mersereau & Shannon, Portland, for Defendant Geske.

## OPINION AND ORDER

HAGGERTY, Chief Judge.

In his second Findings and Recommendation (doc. # 40) in this action, Magistrate Judge Hubel recommended granting defendants' motion to dismiss plaintiffs' first amended complaint (doc. # 28, 30). Plaintiffs filed objections, and the case was referred to this court on November 29, 2002.

The matter is now before the court pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R.Civ.P. 72(b). When either party objects to a Magistrate Judge's Findings and Recommendation on a dispositive motion, the district court makes a *de novo* determination of the Magistrate Judge's report. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.,* 656 F.2d 1309, 1313 (9th Cir.1981). Because the Magistrate Judge's Findings and Recommendation is based on a dispositive motion, the court reviews the Magistrate Judge's decision *de novo.* For the reasons stated below, the court adopts in part and declines to adopt in part the Magistrate Judge's Findings and Recommendation.

## BACKGROUND

Joshua Cain ("Joshua") and Lewis and Vicki Cain ("Joshua's parents") bring this action against Joshua's former school district and football coach under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments of the United States Constitution.

Plaintiffs allege defendant Geske, the Tigard High School football coach, engaged in verbal tirades and emotionally abusive conduct toward Joshua and other high school football players during a summer football training camp in 1999. Plaintiffs lodged a complaint with the defendant school district at the beginning of Joshua's sophomore year. They asserted that Geske had been abusive toward players and covered up a party involving players and the use of alcohol. Prior to this complaint, Geske allegedly struck a player with a metal trash can. Plaintiffs allege

that in response to plaintiffs' assertions, the defendant school district decided to terminate Geske's employment, but that a school board member overrode the decision because his son played on Geske's football team. Geske received a "two strikes" disciplinary order in response to the complaint. Plaintiffs do not further describe the details of this disciplinary order.

Plaintiffs allege that Geske retaliated against Joshua for his parents' complaints. Namely, Geske gathered all of the football players and informed them that a small group of parents were "out to get rid of him" based on charges of racism. Joshua was one of five African–American football players on a team of 120 students. Although Joshua's parents never alleged that Geske's conduct was race-based, Geske made the comment in front of the team in order to identify and to isolate Joshua and his parents, according to the first amended complaint. Geske encouraged a group of parents to approach plaintiffs and verbally attack them for filing the charges with the school district.

During Joshua's sophomore year, Geske frequently confronted Joshua and intimidated him. This interaction was particularly inappropriate because Joshua played on the junior varsity team and Geske's primary responsibility was to the varsity football team. Geske also confronted Joshua on numerous occasions during school hours in front of Joshua's friends.

Plaintiffs lodged a second set of charges with the district in response to Geske's harassing and retaliatory conduct. Plaintiffs allege that Geske's attacks on Joshua only grew worse following the filing of the second set of charges. Specifically, plaintiffs allege that Geske approached Joshua during class time, led him to an equipment room, closed the door, and locked it. Plaintiffs further allege that Geske verbally attacked Joshua in the locked equipment room.

According to plaintiffs, the defendant school district never responded to plaintiffs' second set of charges. In addition to Geske's direct verbal intimidation and physical sequestration of Joshua, other football players chastised and isolated Joshua. As a result of the hostile environment created by Geske's retaliatory conduct, Joshua transferred to a rival high school for his junior year. Notwithstanding this transfer, Joshua remained at his former school for one period each day in order to attend a special integrated math class that was only offered there. While attending this class, Joshua was threatened with physical harm by his former teammates. Plaintiffs reported the incident to the defendant school district, and according to plaintiffs, the district failed to respond. Despite his desire to attend the integrated math class at his former school during his senior year, Joshua could no longer tolerate his former teammates' harassment. He therefore did not attend the integrated math class during his senior year.

The plaintiff parents joined with other parents to lodge formal complaints with the defendant school district about Geske's conduct, alleging that he had violated his "two strikes" reprimand. According to plaintiffs, the district failed to inform plaintiffs of the results of the investigation.

## STANDARDS

Defendants moves to dismiss the entire complaint for failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). When considering motions to dismiss, the court must determine whether it appears beyond a doubt that plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. *See* Fed.R.Civ.P. 12(b)(6); *Steckman v.*

*Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir.1998); *Johnson v. Knowles*, 113 F.3d 1114, 1117 (9th Cir.1997); *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246 (9th Cir. 1997). The reviewing court must treat all facts alleged in the complaint as true, and all doubts are resolved in favor of the nonmoving party. *Gilligan*, 108 F.3d at 248; *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986); *Experimental Eng'g Inc. v. United Technologies Corp.*, 614 F.2d 1244, 1245 (9th Cir.1980).

## DISCUSSION

### A. Joshua's First Amendment Claim

■ Joshua asserts direct and derivative First Amendment claims based on Geske's retaliatory conduct. The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests-especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Plaintiffs contend that Geske punished Joshua for his parents' complaints. Specifically, Geske singled Joshua out in front of the football team and ridiculed him for the complaints. Geske also physically restrained Joshua in a locked equipment room and verbally attacked him.

■ Under the general framework of First Amendment retaliation claims,[1] plaintiffs must show: (1) a loss of a benefit or privilege caused by the retaliatory conduct; (2) plaintiffs were engaged in constitutionally protected speech; and (3) the protected speech was a substantial motivating factor for the adverse action. *Ul-*

*rich v. City and County of San Francisco*, 308 F.3d 968, 976 (9th Cir.2002).

### 1. Loss of a Benefit or Privilege

The court must determine whether the alleged retaliatory conduct denied Joshua a cognizable benefit. Joshua alleges that as a result of Geske's conduct, he was denied the following benefits: (1) his freedom of movement by being locked in an equipment room; (2) his choice of schools by having to transfer to Tualatin High School, which offered inferior academic and athletic opportunities; and (3) the benefit of attending the integrated math class during his senior year of high school. Defendants contend that the Constitution does not guarantee Joshua the right to any of these benefits. According to defendants, because the Constitution does not guarantee Joshua the right to attend the public school of his choice, for example, Geske's retaliatory conduct did not result in the denial of a constitutionally cognizable benefit.

■ Defendants mischaracterize the inquiry. For over fifty years the Supreme Court has made clear:

[E]ven though a person has no 'right' to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to

---

1. The test outlined here has traditionally been applied in the context of public employment. The court will apply this test to the plaintiffs' First Amendment claims. The court finds that a similar analysis is appropriate in situations such as here where the parties share neither a contractual nor an employment re-

lationship. *See Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir.2000); *see also Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir.1994); *Mendocino Envtl. Ctr. v. Mendocino County*, 14 F.3d 457, 459–60 (9th Cir.1994). This approach will be discussed in the context of the parents' First Amendment claim.

a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. *Perry,* 408 U.S. at 597, 92 S.Ct. 2694.

Therefore, the First Amendment is offended not only when a speaker is denied an "entitlement" but also when a lesser interest is effected in such a way that an actor's right to free speech is impaired. *See id.* (even though a teacher is not entitled to the renewal of his contract, he is still denied a benefit when the decision not to renew the contract is made in retaliation for the teacher's exercise of his right to free speech); *Seamons v. Snow,* 84 F.3d 1226, 1236–37 (10th Cir.1996) (high school football player who has no constitutional right to play on the football team is still denied a cognizable benefit when the decision to bar him from playing was made in retaliation for his exercise of First Amendment rights); *Hyland v. Wonder,* 972 F.2d 1129, 1135–36 (9th Cir.1992) (plaintiff who is not entitled to serve as a juvenile volunteer worker nevertheless suffers a cognizable harm when his volunteer status is terminated in retaliation for his exercise of First Amendment rights).

The infringement "need not be particularly great in order to find that rights have been violated." *Elrod v. Burns,* 427 U.S. 347, 359 n. 13, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (noting that the First Amendment is violated "both where the government fines a person a penny for being a Republican and where it withholds the grant of a penny for the same reason."). In fact, the Supreme Court has held that a speaker is protected from "even an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights." *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 75 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (citing *Rutan v. Republican Party of Illinois,* 868 F.2d 943, 954 n. 4 (7th Cir.1989)); *see*

*also Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982) ("The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable.").

█ In this case, Joshua suffered cognizable harms that infringed on his right to speak and associate freely. Plaintiffs have not alleged that Joshua's Fourth Amendment right to be free from unreasonable government restraint was infringed when Geske physically isolated Joshua during school hours, brought him to an equipment room, and locked him in that room in order to verbally attack him, but at the very least, Joshua's freedom of movement was restrained. This is a specific and cognizable harm. The hostile school environment created by Geske's retaliatory conduct prevented Joshua from attending Tigard High School, which allegedly offered superior educational and athletic opportunities. Joshua was unable to attend the integrated math class that was offered only at his former high school. The first amended complaint alleges that these deprivations were specifically motivated by a retaliatory intent to prevent Joshua and his parents from further criticizing Geske and his alleged inappropriate behavior. Because these deprivations were allegedly made in retaliation for Joshua's protected activities, they are sufficiently severe to constitute the loss of a benefit for purposes of Joshua's First Amendment retaliation claim.

### 2. Protected Activity

The second issue is whether Joshua was engaged in activity protected by the First Amendment. Defendants contend that Joshua was never a speaker and therefore was never engaged in protected activity. Defendants are correct in noting that Joshua's parents, not Joshua, filed complaints against Geske. According to de-

fendants' interpretation of the First Amendment, Geske could not have violated Joshua's constitutional rights by retaliating against him for speech made by third parties (i.e. Joshua's parents). Defendants mischaracterize the First Amendment's reach on several fronts.

 The First Amendment protects not only a citizen's right to speak freely but also his or her right to associate freely with other speakers of similar opinions. *See generally Roberts v. U.S. Jaycees,* 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) ("[W]hen the State interferes with individuals' selection of those with whom they wish to join in a common endeavor, freedom of association ... may be implicated."). There are few associational rights more intimate and fundamental than the right of a minor child to associate with his parents who are engaged in protective speech made on the child's behalf. At all relevant times Joshua's parents spoke on his behalf. Additionally, the first amended complaint alleges that Joshua authorized and adopted his parents' criticisms of Geske. Specifically, the first amended complaint states that the "parents were speaking for Joshua Cain, as well as themselves, in attempting to protect Joshua Cain from abusive conduct. Due to his minor status, and the position of authority and power held by Geske, plaintiff Joshua Cain adopted and authorized his parents to attempt to protect him from the abusive conduct by raising the complaints." First Amended Complaint ¶ 76. Geske and the team clearly associated Joshua with the criticisms of the coach. Geske singled out Joshua on numerous occasions and identified him as being a member of one of the families who was trying to have Geske terminated. Varsity football players confronted Joshua and told him to "lay off" Geske. Joshua's junior varsity coach announced at a team meeting that Joshua's parents were complaining about Geske. Based on the facts alleged in the first amended complaint, Geske's conduct was motivated by Joshua's association with his parents' speech (speech which Joshua authorized and adopted) such that he intended to stifle the speech by intimidating and harassing Joshua.

Finally, the fact that Joshua was unable to speak does not mean that he was not engaged in constitutionally protected activity. The First Amendment protects not only Joshua's right to associate with his parents who are speaking on his behalf, but also Joshua's right to speak freely, even if Geske's intimidating conduct successfully inhibited that speech. *See Mendocino Envtl. Ctr. v. Mendocino County,* 192 F.3d 1283, 1300 (9th Cir.1999). Plaintiffs allege that Geske intended to interfere with Joshua and his parents' continued complaints. Geske used race-baiting to isolate Joshua and call the team's attention to Joshua's alleged disloyalty to Geske. The attempt to silence Joshua came both from his coach and fellow players who told Joshua to "lay off" Geske. Finally, Geske brought Joshua to the equipment room during class time, locked him in the equipment room, and berated him. Based on these alleged facts, Geske successfully created an intolerant climate for Joshua such that it was necessary for Joshua to protest Geske's conduct through his parents.

Not only was Joshua engaged in constitutionally protected activity, but the content of that activity was clearly a matter of public concern. *Connick v. Myers,* 461 U.S. 138, 141, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Among other allegations, the charges filed with the school district contended that Geske was abusive toward players and covered up a party involving minors and the use of alcohol. These strong charges involving the coach of a public high school and students are certainly a matter of public concern.

### 3. Geske's Intent

██ The protected activity must be a substantial motivating factor for the adverse action. *Ulrich*, 308 F.3d at 976. The first amended complaint sufficiently alleges that Joshua's association with his parents' complaints and authorization of their speech motivated Geske's retaliatory conduct. Geske humiliated Joshua in front of his peers, encouraged retribution, and physically isolated Joshua as a direct result of Joshua and his parents' protected activity. The first amended complaint alleges that Geske's retaliatory conduct was motivated by plaintiffs' protected activity; plaintiffs have therefore successfully pleaded a First Amendment retaliation claim.

Of course, plaintiffs still maintain the burden of proving the actual occurrence of the events alleged in the first amended complaint. Defendants' motion to dismiss plaintiffs' fourth claim for relief in their first amended complaint is denied.

### 4. Joshua's Derivative Claim

██ Alternatively, Joshua asserts a derivative First Amendment claim on behalf of his parents. In order to have standing to bring a derivative First Amendment claim, the party asserting the claim must show: (1) an injury in fact; (2) a close relationship to the third party; and (3) the existence of a hindrance to the third party's ability to protect his or her own interests. *Wasson v. Sonoma County Junior College*, 203 F.3d 659, 663 (9th Cir.2000). With regard to the third prong, plaintiffs contend that the parents are hindered from protecting their own interests because of this court's dismissal of the original complaint. This is an insufficient basis for asserting a third-party claim. As is discussed below, Joshua's parents are able to bring their own claim. Joshua's derivative First Amendment claim is dismissed. Defendants' motion to dismiss the remainder of Joshua's First Amendment claim is denied.

### B. Parents' First Amendment Claim

Joshua's parents seek relief for violations of their rights secured by the First and Fourteenth Amendments. On April 29, 2002, this court dismissed plaintiffs' original complaint because plaintiffs failed to sufficiently allege the loss of a constitutionally cognizable right or benefit.

In order to more clearly outline the harm suffered by Joshua's parents, plaintiffs' first amended complaint alleges the following deprivations:

A. The benefit of obtaining a public education for their son Joshua in an environment where he was not singled out, harassed, and intimidated;

B. The benefit and privilege of sending their minor child to Tigard High School, as opposed to Tualatin High School, where they had determined their son would receive better educational and athletic opportunities;

C. The benefit offered by defendants to allow plaintiffs to comply with state compulsory education requirements;

D. The right to make educational decisions for their child, as recognized by the United States Supreme Court, including the right to have their child treated equally with other students, despite the parent's exercise of free speech. First Amended Complaint ¶ 62.

██ The analysis of the parents' First Amendment claim is much the same as for Joshua's. Defendants contend that the parents in this case suffered no cognizable harm because the retaliatory conduct was directed at Joshua. However, a parent's constitutional right to criticize school officials would collapse if such an argument were taken to its logical end point. School officials could immunize themselves from

any criticism by swiftly punishing any student who is the child of a critical parent. For example, in retaliation for a parent's public criticism, a school official could decline to place the child in her preferred class schedule. Defendants might contend that the child would have no First Amendment claim because she has no "right" to attend all of the classes of her choice. The parents would not be harmed because only the child endured the brunt of the official's retaliation. In the process, students, parents, and other community members would receive the unequivocal message that the children of critical speakers would suffer the consequences of that speech. The First Amendment affords plaintiffs more protection than defendants' argument allows.

Applying the *Ulrich* framework, the parents were engaged in protected activity by criticizing Geske's abusive conduct toward players and concealment of a party involving minors and the use of alcohol. The content of this criticism was not personal to plaintiffs but was a matter of public concern.

Geske's conduct was substantially motivated by the parents complaints. It was only after learning of the complaints that Geske identified Joshua in front of the team and encouraged other parents to verbally attack plaintiffs.

The only question remaining is whether Joshua's parents suffered a cognizable harm. Plaintiffs were denied the benefit of speaking freely without fear of retaliation against their minor child. Prior to complaining to the school district, the parents enjoyed the benefit of sending Joshua to Tigard High School without worrying that he might be physically constrained by his coach, physically threatened by his teammates, and socially isolated in retaliation for his parents' exercise of their constitutional rights. Just as a public employee has no "right" to an office birthday

party, the parents here had no "right" to send their child to school free from worry. *See Rutan v. Republican Party of Illinois,* 497 U.S. 62, 75 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). However, that loss became a cognizable harm when Geske inflicted emotional injury on the parents through Joshua in order to punish them for their criticism. See *id.* (protecting a speaker from "even an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights.").

Some courts have declined to approach certain First Amendment retaliation claims from a rights/benefits perspective, instead choosing to ask whether the alleged retaliatory conduct would chill a person of normal sensibilities from engaging in future speech. The court finds this analysis helpful in considering the parents' constitutional claim. First Amendment retaliation claims are usually brought in the public employment context. *See Connick,* 461 U.S. at 138, 103 S.Ct. 1684; *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Perry,* 408 U.S. at 597, 92 S.Ct. 2694. The discussion thus far has utilized this traditional analysis, and the court finds that the parents' First Amendment claim satisfies this test. The Ninth Circuit has developed an alternative approach for considering retaliation claims in the context of political speech. *See Sloman v. Tadlock,* 21 F.3d 1462, 1469 (9th Cir.1994); *Mendocino Envtl. Ctr. v. Mendocino County,* 14 F.3d 457, 459–60 (9th Cir.1994). The court finds this analysis to also be applicable in this context where a defendant "is neither an employer nor a party to a contract with the plaintiff." *Worrell v. Henry,* 219 F.3d 1197, 1212 (10th Cir.2000).

■ The test requires proof that: (1) the plaintiff was engaged in constitutional-

ly protected activity; (2) defendant's actions would chill a person of ordinary firmness from continuing to engage in the activity; and (3) defendant's adverse action was substantially motivated by the constitutionally protected activity. *Worrell*, 219 F.3d at 1212; *see also Carroll v. Pfeffer*, 262 F.3d 847, 850 (8th Cir.2001); *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999); *Bloch v. Ribar* 156 F.3d 673, 678 (6th Cir.1998).

■ The first and third prongs are virtually identical to those discussed above. As for the second prong, the parents need not show that Geske was actually successful in deterring their speech. Rather, the inquiry is whether "an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Envtl. Ctr.*, 192 F.3d at 1300 (quoting *Crawford–El v. Britton*, 93 F.3d 813, 826 (D.C.Cir.1996)). Geske's physical and emotional abuse of Joshua would lead ordinary people in Joshua's parents' position to refrain from engaging in future criticism of Geske in order to protect their son from further harm. In fact, Geske could not have chosen a more effective method for stifling the parents' speech than to retaliate against Joshua. Taking the facts alleged in the pleadings as true, the court finds that the plaintiff parents have successfully asserted a First Amendment violation based on Geske's retaliatory conduct. The parents' First Amendment claim survives under the rights/benefits analysis traditionally applied in the public employee context and under the alternative approach discussed here. Defendants' motion to dismiss plaintiffs' first claim for relief in their first amended complaint is denied.

## C. Joshua's Equal Protection Claim

Plaintiffs allege that Geske violated Joshua's Fourteenth Amendment Equal Protection rights when he isolated Joshua in response to his parents' complaints. Plaintiffs contend that they need not point to a suspect classification or deprivation of a fundamental right in order to make out an Equal Protection violation. In fact, plaintiffs concede that Geske's actions were not race-based. This concession is curious in light of plaintiffs' allegation that Joshua was singled out with four other African–American players during practice. Nevertheless, plaintiffs' concession that Geske's actions were race-neutral prohibits the court from evaluating the Equal Protection claim under a suspect classification analysis. Rather, plaintiffs contend that Joshua's claim is covered by the "class of one" doctrine the Supreme Court applied in *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

■ Plaintiffs allege that Geske isolated and harassed Joshua and was motivated by a desire to "get him" in retaliation for complaints raised by Joshua's parents. *Village of Willowbrook* involved a city's discriminatory behavior in conditioning a property owner's connection to a municipal water supply on the owner's granting of an easement. The Supreme Court gave no indication that the holding extended beyond matters involving municipal property disputes. The Supreme Court surely would have spoken more clearly if it intended to extend the reach of the Fourteenth Amendment's Equal Protection Clause to every instance of arbitrary state action. Plaintiffs' wide-ranging interpretation of *Village of Willowbrook* would grant relief to any public employee or student who was "singled out" by a state official. Such a reading extends well beyond the limits of the Fourteenth Amendment. By the parties' own admission, plaintiffs fail to assert Equal Protection claims based on suspect classifications or fundamental

rights. Plaintiffs' third claim for relief in their first amended complaint is dismissed.

## D. Remaining Claims

The remaining claims in plaintiffs' first amended complaint are identical to those in the original complaint. On April 29, 2002, this court adopted the Magistrate Judge's Findings and Recommendation. Because the remaining claims in plaintiffs' first amended complaint are identical to those in the original complaint, the court stands by its earlier ruling and dismisses those claims, with the exception of the third claim for relief in the original complaint asserting entity liability against the school district. The original Findings and Recommendation made no reference to this claim. Plaintiffs were properly permitted to file an amended complaint after the original dismissal. *See Schneider v. California Dep't of Corrections,* 151 F.3d 1194, 1196 (9th Cir.1998) ("[D]ismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." (quoting *Chang v. Chen,* 80 F.3d 1293, 1296 (9th Cir.1996))). The claim reappears in plaintiff's first amended complaint as the fifth claim for relief, which is now before the court. As is true in any situation involving objections to Findings and Recommendation on a dispositive motion, the court must make a *de novo* determination of defendants' motion to dismiss this claim. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.,* 656 F.2d 1309, 1313 (9th Cir.1981). Because the claim for entity liability has not been specifically addressed in any of the prior orders, the court will evaluate the claim now.

## E. Entity Liability

▆▆▆ Plaintiffs' fifth claim for relief in their first amended complaint asserts entity liability against the district for Geske's conduct. In order to hold a governmental entity liable under § 1983, plaintiffs must allege: (1) the constitutional tort was committed pursuant to an official policy, custom, or practice; and (2) there is a causal link between the policy or custom and the injury. *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Monell v. Dep't Soc. Services of City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A school district may not be held liable in a § 1983 action under a theory of *respondeat superior. Monell,* 436 U.S. at 691, 98 S.Ct. 2018. Thus, without more, the fact that the Tigard–Tualatin School District employed Geske is not enough to expose the district to liability for Geske's conduct during school hours. In order to successfully plead entity liability under § 1983, plaintiffs must point to an official policy or custom that enabled the misconduct to continue. The district may be liable for "deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Id.*

▆▆▆ As for the official policymakers of the entity, such as school board members, "it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur or by acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (internal citations and quotation marks omitted).

Plaintiffs allege that the school district learned of Geske's conduct, failed to investigate plaintiffs' accusations, and did not properly discipline Geske for his misconduct. Thus, plaintiffs charge that the dis-

trict's official policy, practice, and custom was to inadequately supervise and discipline Geske. Plaintiffs further allege that the district failed to discipline Geske for his breach of the "second strike" when he engaged in retaliatory conduct for plaintiffs' subsequent complaints.

 Plaintiffs have sufficiently pleaded a claim for entity liability based on the district's policy and custom. Plaintiffs allege that the district's repeated failure to discipline Geske became the district's custom. The district's decision not to terminate Geske because a school board member's son played on Geske's team may be viewed as part of the district's policy to employ an abusive coach, notwithstanding parental complaints. Further discovery may or may not substantiate plaintiffs' claim that the district officially approved of Geske's conduct by failing to properly respond to complaints. Defendant's motion to dismiss plaintiffs' fifth claim for relief in their first amended complaint is denied.

## CONCLUSION

The court adopts in part and declines to adopt in part the Magistrate Judge's Findings and Recommendation. Defendants' motion to dismiss the first, fourth, and fifth claims for relief of plaintiffs' first amended complaint is denied. Plaintiffs' remaining claims are dismissed with prejudice.

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATION

HUBEL, United States Magistrate Judge.

This matter is before the court on defendant School District's motion to dismiss plaintiffs' first amended complaint (# 28)

1. Chris Cain is not a party to this action.

2. Kurt is not a defendant in this action.

and on defendant Geske's motion to dismiss plaintiff's first amended complaint (# 30). For the following reasons, both motions should be granted.

## BACKGROUND

In 1996, defendant Tigard–Tualatin School District ("School District") hired defendant Geske as a physical education teacher and to coach football. Plaintiffs Vicki and Lewis Cain felt that Geske was failing to properly promote and manage their son Chris' recruitment for college football in 1996.[1] Vicki and Lewis Cain talked about their concerns to their friends and Geske heard their comments.

Geske called Vicki and Lewis Cain and threatened Lewis Cain stating that he would "send Chris and his parents down the road and that Chris would never play for anyone again if plaintiffs challenged his coaching conduct." Complaint ¶ 18. At the end of the 1996–1997 academic year, Chris Cain accepted a full scholarship to play football at Portland State University.

In the summer of 1999, prior to his sophomore year at Tigard High School, plaintiff Joshua Cain attended a football camp organized and conducted by Geske for Tigard High School football players, the Makers of Champions camp ("MOC"). Geske engaged in verbal tirades and emotionally abusive conduct during MOC which resulted in Vicki and Lewis Cain lodging a complaint with the School District's athletic director, Tom Kurt.[2]

Kurt interviewed plaintiffs and others. As a result of plaintiffs' complaints, the school district opened a formal investigation of Geske conducted by Kurt and defendant Randy Harvey.[3] Plaintiffs believe

3. The court dismissed plaintiffs' claims against Harvey alleged in the original complaint. Plaintiffs stated at oral argument that they did not intent to bring their amended complaint against Harvey.

that the investigation resulted in a decision to terminate Geske's employment or his position as head football coach. However, plaintiffs believe that the vice-chairman of the school board vetoed or overroad the decision to terminate Geske.[4] The school board decided to discipline Geske with a "two-strikes" order.

At the summer barbeque following the summer football team practice sessions, Geske assembled the football players in the bleachers and told them that there was a group of parents out to get rid of him and that one of the charges was racism.[5] Also at the barbeque, a parent approached Vicki Cain and expressed anger towards her for complaining about Geske. The parent then informed an impromptu meeting of parents at the barbeque that the Cains had made a complaint against Geske. Plaintiffs believe Geske informed the parent about the complaint.

In early September, 1999, a letter circulated to parents of football players opposing the complaint raised by plaintiffs, the school district investigation, and the discipline imposed on Geske. A petition in support of Geske accompanied the letter.

In September 1999, Joshua Cain began his sophomore year at Tigard High School. Juniors and Seniors on the football team made negative comments to Joshua telling him to "lay off" Geske. Joshua's JV coach commented to Joshua in front of his teammates that he heard that Vicki and Lewis Cain complained about Geske.[6] During the 1999 football season Geske commented

to Joshua that he had heard that Vicki and Lewis Cain were complaining about him. After the 1999 football season, Joshua reported to his parents that he could no longer tolerate Geske's conduct.

Vicki and Lewis Cain contacted Kurt and scheduled a meeting with Kurt, Harvey, and principal Kubiaczyk.[7] Harvey told plaintiffs that he was concerned that Geske was breaking the contract he signed and that he might be harassing Joshua.

After this meeting, Geske took Joshua to an equipment room and yelled at him. Geske told Joshua that he was sick and tired of Joshua ignoring him and that he wouldn't stand it for any longer. Vicki and Lewis Cain reported this incident to Kurt. Kurt turned the matter over to Harvey for investigation. Harvey did not report to plaintiffs the result of the investigation.

Joshua transferred from Tigard High School to Tualatin High School for his junior and senior years. However, Joshua took an integrated math course during his junior year at Tigard High School for one class period each day. Although plaintiffs do not allege that Joshua had any contact or interaction with Geske, the class time at Tigard High School caused stress for Joshua.

During the week preceding the Tigard–Tualatin football game, two Tigard football players approached Joshua and threatened to harm him during the game.[8] Lewis and Vicki Cain reported this incident to Kurt,

---

4. This individual is not identified in the complaint and it is unclear whether he is intended as one of the John Doe defendants in this action.

5. Plaintiffs deny making any allegations of racism.

6. This individual is not identified in the complaint and it is unclear whether he is a defendant.

7. Kubiaczyk is not a defendant in this action.

8. These individuals are not identified, nor do plaintiffs' allege a claim for failure to protect Joshua Cain from students in their amended complaint.

who turned the matter over to Harvey for investigation. Harvey did not report the results of his investigation to Vicki and Lewis Cain.

Joshua Cain did not take the integrated math course at Tigard High School in his 2000–2001 academic year. However, in November and December 2000, a group of parents, including Lewis and Vicki Cain, made formal complaints about Geske's conduct to the School District. Harvey investigated these complaints, but did not inform the parents of the results of the investigation.

In the Spring of 2001, the School District responded to a request for information by counsel of the parents of another student, that the District had thoroughly investigated "all matters pertaining to allegations against Geske and taken appropriate action." Complaint ¶ 55. A group of parents who supported Geske organized a campaign to attempt to discredit and intimidate the group of parents opposed to Geske. Plaintiffs believe the group of parents supporting Geske operated with his knowledge and consent.

In the original complaint, plaintiffs Vicki and Lewis Cain alleged violation of their First and Fourteenth Amendment rights. Plaintiff Joshua Cain alleged violation of his First and Fourteenth Amendment rights and violation of substantive due process. Defendants moved to dismiss all claims. The court granted this motion, but gave plaintiffs leave to amend their complaint.

Plaintiffs filed a first amended complaint containing the same factual allegations as the original complaint. As in the original complaint, plaintiffs Vicki and Lewis Cain allege violations of their First and Fourteenth Amendment rights. Joshua Cain alleges violation of his Due Process rights as in the original complaint, however, Joshua Cain now also alleges violation of

his Equal Protection rights and a violation of his First Amendment rights.

Defendants move to dismiss the first amended complaint in its entirety. This matter is now properly before the court.

## STANDARD

On a motion to dismiss, the court must review the sufficiency of the complaint. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The court should construe the complaint most favorably to the pleader:

> In evaluating the sufficiency of the complaint, we follow, of course, the accepted rule that the complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The allegations of material fact must be taken as true. *Moyo v. Gomez,* 40 F.3d 982, 984 (9th Cir.1994).

## DISCUSSION

I. Plaintiffs Lewis and Vicki Cain

As the court noted above, the first amended complaint contains no new or altered factual allegations. Plaintiffs Vicki and Lewis Cain make exactly the same claims for relief in the first amended complaint as they made in the original complaint. However, in the first amended complaint, Vicki and Lewis Cain added the following paragraph to their allegation of a First Amendment violation:

> Defendants' retaliatory conduct deprived plaintiffs Lewis and Vicki Cain of the following benefits and privileges:
>
> A. The benefit of obtaining a public education for their son Joshua in an environment where he was not

singled out, harassed, and intimidated;

B. The benefit of sending their minor child to Tigard High School, as opposed to Tualatin High School, where they had determined their son would receive better educational and athletic opportunities;

C. The benefit offered by defendants to allow plaintiffs to comply with state compulsory education requirements;

D. The right to make educational decisions for their child ... including the right to have their child treated equally with other students ....

First Amended Complaint ¶ 62.

As the court noted in its findings and recommendation on the motion to dismiss, pursuant to the First Amendment, "public officials may not deny or deprive a person of a governmental benefits or privilege on a basis that infringes on her or his freedom of speech." *Hyland v. Wonder*, 972 F.2d 1129, 1134 (9th Cir.1992), *cert. denied* 508 U.S. 908, 113 S.Ct. 2337, 124 L.Ed.2d 248 (citations omitted). Courts have recognized a number of public benefits which public officials may not deny for the exercise of constitutional rights. *See Rutan v. Republican Party*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (promotion or transfer in a government job); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310 (9th Cir.1989) (suspension of petroleum plant bulk use permit); *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502 (9th Cir.1988) (exemptions from import duties). However, in each of these cases, the individuals denied the benefits were the same individuals who exercised their constitutional rights. In this case, Vicki and Lewis Cain allege that they exercised their First Amendment right to free speech, but ultimately, Joshua Cain was denied his right to a free and appropriate education at the school of his parents' choosing.

The court found in its dismissal of the original complaint that Joshua Cain and his parents were not deprived of a free education noting that it was undisputed that Joshua Cain continued to attend high school at all relevant times during the events in question. Joshua Cain's transfer to a different free, public, high school within the same district did not constitute a deprivation of educational benefit. Although the Supreme Court has held that once a state undertakes to provide a free, public education to the citizens of that state, those citizens have a property interest in that education subject to procedural due process, the Court has not held that citizens have a right to education at a particular school within the state. *See Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Rather, "[b]y and large, public education in our Nation is committed to the control of state and local authorities." *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). Oregon statutes do not provide any right to attend a particular free public institution within a district, but rather provide only for free, public education within school districts. *See* O.R.S. 339.010, 339.020, 339.115.

Accordingly, the court held that Joshua Cain's transfer to Tualatin High School from Tigard High School did not constitute a denial of a free and appropriate education. Plaintiffs attempt to avoid this determination a second time by adding the above noted paragraph to the amended complaint. However, the additional allegations do not change the court's analysis. The Supreme Court has not held that citizens have a right to education at a particular school, nor has the State of Oregon recognized any such "right."

Therefore, because Vicki and Lewis Cain fail to allege deprivation of any benefit or privilege protected by the Constitution or laws of the United States, they fail to state a claim for violation of their First Amendment rights. Defendants' motions to dismiss Vicki and Lewis Cain's claims should be granted.

## II. Plaintiff Joshua Cain

### A. Due Process Claim

Joshua Cain alleges deprivation of substantive due process in his liberty interest in attending school free from harassment, intimidation, and retaliation. Joshua's Due Process claim in the first amended complaint is an exact duplicate of his due process claim in the original complaint. Further, plaintiffs have not set forth any new or additional facts in support of Joshua Cain's allegations of due process violations. Therefore, relying on the reasoning in the findings and recommendation on the motion to dismiss the original complaint in this action, the court reaches the same determination with respect to this claim on the first amended complaint as it did on the original complaint. Defendants' motions to dismiss should be granted with respect to Joshua Cain's due process claim.

### B. First Amendment

Joshua Cain alleges that as a minor he "was entitled to First Amendment protection against retaliation for his parents' complaints about Geske." With respect to an allegation of violation of his First Amendment rights, the court refers to its above discussion and conclusion that neither Joshua nor his parents were deprived of any benefit or privilege protected under the First Amendment. Specifically, they were not denied a free education.

However, in their response to the motions to dismiss, plaintiffs make clear that Joshua Cain intends to bring a derivative First Amendment claim based on his parents' speech. Although "[p]arties ordinarily are not permitted to assert constitutional rights other than their own," under certain circumstances, plaintiffs may bring derivative actions. *Wasson v. Sonoma County Junior College*, 203 F.3d 659, 663 (9th Cir.2000) (citing *NAACP v. Alabama*, 357 U.S. 449, 459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)). In order to bring a third party derivative claim for a First Amendment violation, plaintiff must allege that (1) he suffered an injury in fact; (2) he has a close relationship to the third party; and (3) there exists some hindrance to the third party's ability to protect his or her own interests. *Wasson*, 203 F.3d at 663.

As the court has noted a number of times, Joshua Cain has not suffered the injury in fact he alleges, i.e. he was not deprived of a free education within the context of the Constitution, federal law, or state law. Furthermore, there is no demonstrated hindrance of the parents', Lewis and Vicki Cain, protection of their own interests (First Amended Complaint ¶ 62). Accordingly, Joshua Cain cannot bring a derivative First Amendment claim. Therefore, defendants' motion to dismiss these claims should be granted.

### C. Equal Protection

Joshua Cain further alleges a violation of his Equal Protection rights.[9] Joshua Cain alleges that defendant Geske isolated a small group of students, including Joshua Cain, and that Geske used his position as a teacher to treat this group differently from other students. Amended Complaint ¶ 71. Joshua Cain alleges that this con-

---

**9.** Plaintiffs state in their response to the motion to dismiss that this claim is brought only against defendant Geske.

duct violated the Equal Protection clause relying on the "class of one" theory propounded by the Supreme Court in *Village of Willowbrook v. Olech,* 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

In *Olech,* plaintiffs applied to the Village to connect their property to the municipal water supply. *Olech,* 528 U.S. at 563, 120 S.Ct. 1073. The Village conditioned the connection on plaintiffs granting the Village a 33 foot easement. *Id.* Plaintiffs objected noting that the Village required only a 15 foot easement from other property owners. *Id.* After delaying three months, the Village relented and agreed to connect plaintiffs with only a 15 foot easement. *Id.*

Plaintiffs sued alleging that the Village's demand of a 33 foot easement violated plaintiffs' Equal Protection rights. *Olech,* 528 U.S. at 563, 120 S.Ct. 1073. The Court, in affirming the Court of Appeals reversal of the District courts' dismissal of plaintiffs' claim recognized a "class of one" equal protection claim noting that such claims arise where "the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564, 120 S.Ct. 1073.

Joshua Cain alleges that this "class of one" analysis applies to his claim for violation of the Equal Protection Clause. The court disagrees. As a preliminary matter, the court has reservations as to whether the "class of one" theory applies in this context. The District of Massachusetts discussed this theory in relation to an employment based equal protection claim noting:

> While this theory may have some viability in certain contexts, ... the applicability of the "class of one" theory to an employment-based equal protection claim seems dubious. *Olech* ... was a discriminatory zoning case, and Justice

Breyer in his separate concurrence expressed concern about transforming "run-of-the-mill zoning cases into cases of constitutional right." In this case, if plaintiff is correct on the law, any public employee convinced that someone similarly situated is being treated more favorably could sue his or her employer under the Fourteenth Amendment for a violation of equal protection. Since practically every employee, public or private, is bound to be convinced at some point that he or she is getting the short end of the stick, it is not hard to imagine the bee hive of constitutional litigation that would be generated by this variant of this "class of one" doctrine. It seems unlikely that the Supreme Court intended such a dramatic result in its *per curiam* opinion in *Olech.*

*Campagna v. Commonwealth of Massachusetts,* 2002 WL 1277221 (D.Mass.2002) (quotations omitted). The District of Massachusetts' concerns regarding the potential scope of litigation under the "class of one" theory are well taken. However, the court need not decide whether the "class of one" theory applies in this case, because, even if it does apply, Joshua Cain's Equal Protection claim fails.

Unlike the plaintiffs in *Olech,* and the plaintiffs in the cases cited by Joshua Cain in support of this claim, Joshua Cain has not alleged that Geske's conduct was in retaliation for Joshua's constitutionally protected activity. In *Olech,* plaintiffs claimed that the Village attempted to get a greater easement in retaliation for the plaintiffs' prior litigation against the Village. *Olech,* 528 U.S. at 563, 120 S.Ct. 1073. Similarly, in *Esmail v. Macrane,* 53 F.3d 176 (7th Cir.1995), plaintiff alleged that his application for a liquor license renewal was denied in retaliation for plaintiff's prior conduct including getting a revocation of his liquor license downgraded to a suspension and withdrawing political and financial

support from the mayor. *Esmail,* 53 F.3d at 178.

As the court in *Joubran v. McCord,* 2001 WL 1218340, 2001 U.S. Dist. LEXIS 16534 (E.D.Mich.2001), explained "[e]ven assuming that plaintiff[ ] can proceed as a 'class of one,' [he] must still demonstrate that [he was] deprived of a constitutionally protected right." *Id.* 2001 WL 1218340, at *8. In *Joubran,* plaintiffs sued the school district, their teacher, and their principal alleging violation of their constitutional rights relating to a number of negative statements made by their teacher. *Id.* 2001 WL 1218340, at *1. Plaintiffs alleged a violation of their equal protection rights on the basis that they were denied a property interest in "pursuing their education in a hassle-free environment and a 'liberty interest' in maintaining their reputation." *Id.* 2001 WL 1218340, at *9. In denying plaintiffs' equal protection claims, the court noted that the situation in *Joubran* differed from that in *Goss* because plaintiffs in *Joubran* were never suspended or expelled and "the suspension or expulsion from school is the basis of the holding in *Goss.* Furthermore, *Goss* discussed a property interest in 'education,' not a right to education 'in a hassle-free environment. Moreover, ... damage to one's reputation... without more does not result in a deprivation of liberty." *Joubran,* 2001 WL 1218340, 2001 U.S. Dist. LEXIS 16534 at *10. The court's reasoning in *Joubran* is persuasive.

Joshua Cain cites no authority for the idea that standing may be conferred on an individual subjected to allegedly arbitrary treatment solely because of the conduct of a third party. This court could not find a case involving the "class of one" theory conferring standing on a plaintiff alleging violation of his constitutional rights due solely to the conduct of third parties, in this case his parents. If the idea of a derivative equal protection claim was rec-

ognized by the courts, Joshua Cain would be unable to bring such a derivative claim for the same reasons discussed above that preclude him from bringing a derivative First Amendment claim.

Accordingly, defendant Geske's motion to dismiss should be granted with respect to Joshua Cain's claim of an equal protection violation.

## RECOMMENDATION

Defendants Harvey and School District's motion to dismiss (# 28) should be GRANTED. Defendant Geske's motion to dismiss (# 30) should be GRANTED.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due November 13, 2002 If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due November 27, 2002, and the review of the Findings and Recommendation will go under advisement on that date.

Oct. 29, 2002.